HERNE v. LIEBLER et al.

(Supreme Court, Appellate Division, First Department. June 6, 1902.)

1. LITERARY PROPERTY—THEATRICAL PLAY—CONTRACT FOR PRODUCTION.
    A contract between the author of a play and a theatrical firm provided that the firm should have the exclusive right to produce the play for a certain period, during which it was not to be published in any manner, but was to remain in manuscript, and to be used only for production by the firm; that the firm should produce the play continuously during the prescribed period; that the actors were to be subject to the author's approval, and the play was to be produced only in first-class theaters; and that, on termination for any cause, all rights in the play were to revert to the author. Held, that the firm had only the right to produce the play with companies organized by itself, and no right to license other theaters or companies to produce it, though such licensing was for the purpose of avoiding heavy losses.

2. SAME—VIOLATION OF CONTRACT—INJUNCTION.
    Where a contract between the author of a play and a theatrical firm gives the firm a right to produce the play with their own companies, but not to license stock companies or others to produce it, and it appears that such licensing will greatly decrease the value of the play, an injunction will be granted to restrain the firm from violating the contract by licensing stock companies to produce the play.

Appeal from special term, New York county.

Suit by Katherine Corcoran Herne, individually and as executrix, against Theodore A. Liebler and another. From an order denying plaintiff a temporary injunction, she appeals. Reversed.

Argued before HATCH, McLAUGHLIN, PATTERSON, O'BRIEN, and INGRAHAM, JJ.

William M. Mullen, for appellant.
A. H. Hummel, for respondents.

INGRAHAM, J.   The action is brought to restrain the defendants from violating a contract made between the plaintiff's testator and the defendants, by which the latter were given the exclusive right to produce a play written and owned by the plaintiff's intestate, called "Sag Harbor," for a period of four years from the 1st day of October, 1899.   The only relief asked for in the complaint is the injunction that the plaintiff claims she is entitled to.   The contract, dated August 7, 1900, recites that the party of the second part (plaintiff's testator) was "the author and sole and absolute owner of the manuscript of the play known as 'Sag Harbor,' which he is desirous of having produced upon the stage," and the parties of the first part (defendant) are desirous of producing the said play in the manner and for the period stated, and the parties to the agreement are prepared to enter into an agreement, which shall be limited, however, exclusively to matters in connection with the production, management, and exhibition of said play on the terms and conditions stated in the agreement.   There was then granted to the defendant the exclusive right to produce the said play in the United States and Canada for the period of four years, commencing on the 1st day of October, 1899, and ending on the 13th day of September, 1903, who agreed that during the said period the said play should not be published or in any manner dedicated to the public, but should remain in manuscript form, and be used only for the stage production by the defendants; that they would give the first production of the said play as soon after October 1st as should be possible, in conformity with the terms of the contract (in any event, before January 1, 1900), and produce the said play continuously during the regular theatrical seasons throughout the period of this contract; the defendants to furnish such money as should be necessary for the production of the play.   The selection of actors and actresses for the production of the play was to be subject to the approval of the plaintiff's testator; but performances were to be given only at first-class theaters.   It was further agreed that at the expiration of the agreement, or its termination for any cause whatsoever, all rights and privileges in and to the said play, "Sag Harbor," and the manuscript thereof, thereby granted, should revert and belong to the plaintiff's testator.   It appeared that the parties proceeded under this agreement until the death of the plaintiff's testator, which took place on the 2d of June, 1901; that subsequent to his death one of the defendants saw the plaintiff, and stated to her that, inasmuch as it was a question whether the death of the plaintiff's testator ended the contract between them, he asked her to continue under the same terms and conditions as it had theretofore existed, to which the plaintiff consented; that on the 13th day of January, 1902, the plaintiff received a letter from one of the defendants asking the plaintiff to consent to negotiate for the production of "Sag Harbor" in the Pike Opera House, Cincinnati, Ohio, to which plaintiff refused to consent; that on the 20th of February, 1902, the plaintiff received a letter from one of the defendants, which, after stating that the performance of the play by the defendants had not been successful, stated that it was his

intention to close the season at Kansas City, or prior to its date there, which was March 16th, and "try and place it satisfactory in stock," and asking the plaintiff to approve this determination, which the plaintiff refused to do. It is alleged by the plaintiff that the words "stock theaters" have a well-defined meaning in the theatrical world, meaning theaters supporting stock companies which produce the successes of the first-class theaters after their drawing powers have been exhausted on the stage of such theaters; that, if this play is once produced in stock theaters, the commercial value of the said play will be destroyed. Other affidavits were submitted which tend to show that the performance of this play in the stock theaters would seriously depreciate its value; that plays of this character were invariably produced in first-class theaters for five or six seasons before being produced in stock theaters, and the rights therein are granted to stock companies only when the play can no longer command patronage in first-class houses; that a play named "Shore Acres," written by the plaintiff's testator, was produced for a period of some seven years in the first-class houses, and is now proving a great attraction in houses of the second class; that, if the right to exploit "Sag Harbor" is granted to stock companies, its commercial value will be practically stopped in a short time, and great damage will result to the owner thereof,—damage which is practically irreparable, the amount of which it was impossible to estimate, owing to the fact that the profits in the theatrical business are largely speculative. It further appeared that the defendants had granted to a firm called Darcy & Wolford, play agents, the right to lease this play, "Sag Harbor," to stock companies; that this firm had closed a contract for this play with the Pike Opera House, Cincinnati, Ohio; and that the manuscript and parts of the said play had been expressed to the proprietor of this firm, they to pay the royalty of $350 per week. On behalf of the defendants it appeared that during the first season this play earned a profit of upwards of $28,000, of which the plaintiff's testator received a sum in excess of $12,000, and in addition thereto received $500 per week for each week during which he acted in the play; that during the second season there was a loss of $3,559.63, and that prior to the opening of the third season the plaintiff's testator died; that after the death of the plaintiff's testator the defendants continued the performance down to March 1st, during which period the loss amounted to $3,854.52; that the defendants thereupon determined that it was to the interest of the plaintiff, as well as themselves, in order to recoup their losses so far as they were able during the remainder of the term of their rights to produce the play, to close the tour of their company, and secure engagements for the play with stock companies. It is undoubtedly true that if the defendants are allowed to lease this play to theaters having stock companies, all over the United States, the interest of the plaintiff in the play will be seriously affected, as, at the expiration of the contract, if the play is not performed in stock companies, she would then have the right to lease it to these companies, and receive the full price paid for the right to produce it.

I do not think that this contract gave to the defendants the right to license this play to be produced in any theaters except where it was produced by a company to be organized by them. The agreement recited that the parties thereto were prepared to enter into an agreement, "which shall be limited, however, exclusively to matters in connection with the production, management, and exhibition of said play on the terms and conditions hereinafter stated." The defendants were not granted the right to license others to produce the play, but the right that they had was to produce the play themselves; and the defendants agreed that during that period the said play should not be published, but should remain in manuscript form, "and be used only for the plays produced by the parties of the first part." There was nothing in the contract that gave the defendants any right, except to produce the play, and it was to be used only for the stage production by them. It was agreed that the defendants would continue to produce the play continuously during the regular theatrical seasons during the time that the contract was in force. This clearly contemplated a production of the play by the defendants, not by stock companies that they should license to produce it; and the provision that was inserted, by which, in the event that the production of the said play should result in a loss amounting to the sum of $5,000, the defendants, by notice to the other party, could terminate the agreement, gave the defendants the option to terminate the agreement if the production of the play should prove unprofitable, but the fact that the play did prove unprofitable did not justify them in using the play for a purpose other than that contemplated by the agreement. Undoubtedly the parties contemplated that the plaintiff's testator would live during the period that the contract was to run, and there is a question whether the contract was not terminated by the death of the plaintiff's testator. However that might be, it was not contemplated that the defendants should have any right over the play, except the exclusive right to produce it themselves. A delivery of this manuscript to other theaters and other actors than those forming a part of the company organized for the production of this play would be a direct violation of the provision by which it was expressly agreed that the play should remain in manuscript, and be used only for the stage production by the defendants. The agreement clearly contemplated such a restriction of the use of this play by the defendants. Thus it was provided that, if it was mutually deemed advisable, the defendants were authorized to form another theatrical company for the production of the play. Certainly if the defendants had the right to license other theaters to use this play, and to deliver the manuscript to such other theaters for that purpose, this clause would be entirely meaningless; and the further clause in the agreement by which the plaintiff's testator was to have the right to supervise the management of the stage, and that the selection of the actors and actresses for the production of the play should be subject to his approval, clearly contemplated but one use to be made of this play during the four years, and that is the production of the play by a company formed by the defendants for that purpose. The defendants have now, as they had at any time during the continuance of

the agreement, the right to terminate it when the loss should equal
$5,000; but they had no right to use the play in any way except that
contemplated by the agreement (that is, the production of the play
by a company or companies organized by themselves, and under their
control); and it seems to me clear that licensing of other theaters
to produce this play was a direct violation of the plaintiff's rights,
and would be a serious injury to her interest. The facts are substan-
tially undisputed, the only real dispute being as to the construction of
the contract, which was a question for the court; and we disagree
with the court below as to the construction to be given to this con-
tract, and are of the opinion that the use which the defendants in-
tended to make of this play was in violation of its terms and of the
plaintiff's rights, and the plaintiff was entitled to an injunction.

It follows that the order appealed from should be reversed, with
$10 costs and disbursements, and the motion to continue the injunc-
tion granted, with $10 costs. All concur.