**REPUBLIC PICTURES CORP. et al.**

**v.**

**ROGERS.**

**No. 13314.**

United States Court of Appeals, Ninth Circuit.

June 4, 1954.

———◆———

Loeb & Loeb, Frank B. Belcher, H. L. Gershon, Herman F. Selvin, Los Angeles, Cal., for appellants.

Gibson, Dunn & Crutcher, Frederic H. Sturdy, Richard H. Wolford, Henry F. Prince, Samuel O. Pruitt, Jr., Los Angeles, Cal., for appellee.

Before HEALY, BONE and POPE, Circuit Judges.

BONE, Circuit Judge.

This is an appeal from a judgment of the United States District Court for the Southern District of California, Central Division, enjoining appellants from distributing or licensing the exhibition of eighty-one motion pictures produced and owned by them upon sponsored or sustaining television programs. In each of those motion pictures appellee appears as the principal actor. Appellants claim the right, under contracts with appellee, to freely exhibit motion pictures produced pursuant to such contracts, on television or by any other means, regardless of whether advertising is connected with such exhibitions. All parties agree that pursuant to said contracts, appellee and only appellee has the right to use his name, picture or voice in advertisements (except for advertisements of motion pictures). Appellee contends that the exhibition of motion pictures in which appellee is the leading actor, upon commercially sponsored television programs, would be an advertising use of his name, picture and voice, a right not granted by the said contracts. Necessarily we must commence our study of this conflict by examining the contractual provisions which bear upon the controversy.

Only two contracts are involved, one executed in 1937, and the other in 1948. The pertinent parts of these contracts are excerpted as follows:

The 1937 contract, paragraph 4: "The artist expressly gives and grants to the producer the sole and exclusive right to photograph and/or otherwise reproduce any and all of his acts, poses, plays and appearances * * * during the term hereof * * *; and further gives and grants to the producer solely and exclusively all rights of every kind and character whatsoever in and to the same, or any of them, perpetually, including as well the perpetual right to use the name of the artist and pictures or other reproductions of the artist's physical likeness, and recordations and reproductions of the artist's voice, in

---

connection with the advertising and exploitation * * *. The artist does also hereby grant to the producer, during the term hereof, the sole and exclusive right to make use of, and to allow others to make use of, his name for advertising, commercial and/or publicity purposes (other than in connection with the acts, poses, plays and appearances of the artist hereunder), as well as the sole and exclusive right to make use of and distribute * * * his pictures, photographs or other reproductions of his physical likeness and of his voice for like purposes."

The 1948 contract, paragraph 4: "(A) The Artist hereby grants to Producer the sole and exclusive right to his services for motion picture purposes during the term hereof * * * to photograph and/or otherwise reproduce any and all of his acts, poses, plays and appearances * * * and to record his voice and all instrumental, musical and other sound effects produced by him * * *. The Artist also grants to the Producer, solely and exclusively, all rights of every kind and character whatsoever in and to all such photographs, reproductions and recordings and all other results and proceeds of his services hereunder, perpetually, and also the perpetual right to use the Artist's name and pictures or other reproductions of his physical likeness and recordations and reproductions of his voice, in connection with the advertising and exploitation thereof * * *.

"(B) For the purpose of advertising the photoplays to be produced hereunder, and subject to the reservations set forth in Subparagraph (C) of this Paragraph 4, the Artist also hereby grants to the Producer the right, during the term hereof, to use and/or authorize the use of his name and/or likeness in so-called 'commercial advertising,' to wit, advertising relating to products other than motion pictures, [subject to a number of limitations.]

"(C) The Artist reserves to himself the right to enter into any and all commercial tie-ups for products of every kind or character (other than motion pictures) * * *."

It will be noted that these contracts use two different sets of descriptive words, not common in most contracts nor in ordinary parlance. They are (1) "acts, poses, plays and appearances" and (2) "name, voice and likeness." If these two sets of descriptive words mean one and the same thing, then appellants must probably be denied the result which they seek here, for it is clear to appellants, to appellee and to us that any contractual right which appellants had, to the use of appellee's "name, voice or likeness," in advertising anything other than the motion pictures, expired with the expiration of the contracts. The only issue would then be whether the proposed exhibition of these films would be an advertising use of appellee's name, voice and likeness.

But if those two sets of descriptive words mean two entirely different things, then any restriction upon one need not necessarily have any relation to rights to the other. It is appellants' contention that "acts, poses, plays and appearances" refer to the embodiment of appellee's services in the motion pictures where he appears, acts, poses and plays. Appellants distinguish the use of the product and reproduction of his acts, poses, plays and appearances in motion pictures, from the use of appellee's name, likeness and voice apart from their embodiment in motion pictures.

■ On their face, these contracts purport to be California contracts and that fact is not disputed. Being a diversity of citizenship case, the contracts will be interpreted so as to reach the same results as would be reached in a California court. Erie R. R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188; Sampson v. Channel, 1 Cir., 110 F.2d 754, 128 A.L.R. 394. In ascer-

taining whether or not these contracts are ambiguous, as found by the trial court, and in interpreting the contracts, this court is not bound by the findings of the trial court for in those matters we are principally concerned with questions of law. Brown v. Cowden Livestock Co., 9 Cir., 187 F.2d 1015, 1018; Plomb Tool Co. v. Sanger, 9 Cir., 193 F.2d 260, 264.

The focal point of this case does not involve any difficult questions of California law; rather, the principal points of reference in that law are quite well laid out. The statutory rules regarding interpretation of contracts are set forth in Calif.Civil Code §§ 1635–1662. We make particular reference to § 1638 ("The language of a contract is to govern its interpretation, if the language is clear and explicit, and does not involve an absurdity"), § 1641 ("The whole of a contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the other"), § 1645 ("Technical words are to be interpreted as usually understood by persons in the profession or business to which they relate, unless clearly used in a different sense"), § 1650 ("Particular clauses of a contract are subordinate to its general intent") and to §§ 1856, 1857, and 1858 of the Calif.Code of Civil Procedure.

■ In applying the noted code sections and related law, the California appellate courts have made it abundantly clear that when parties set forth their agreement, as was done in this case, in a contract which attempts to cover all of their relationships in the business involved, these rules apply: (1) the interpretation to be given a contract is determined as a matter of law solely from the instrument itself if that can possibly be done without making any part of the instrument nugatory, or reaching an absurdity, and an appellate court is free to adopt its own construction, Moss Construction Co. v. Wulffsohn, 1953, 116 Cal. App.2d 203, 205, 253 P.2d 483; Miranda v. Miranda, 1947, 81 Cal.App.2d 61, 66–67, 183 P.2d 61; (2) the contract must be taken by its four corners, and read so as to effectuate every part, if that may reasonably be done, Kohn v. Kohn, 1950, 95 Cal.App.2d 708, 713, 214 P.2d 71; Miranda v. Miranda, supra; (3) and particularly, courts are loathe to impose limitations or restrictions upon the parties which are not expressly contained in their agreement or which do not arise by necessary implication, and without such implied restrictions the contract could not be effectively performed, Tanner v. Title Ins. & Trust Co., 1942, 20 Cal.2d 814, 824, 129 P.2d 383; Stockton Dry Goods Co. v. Girsh, 1951, 36 Cal.2d 677, 679, 227 P.2d 1, 22 A.L.R. 2d 1460; Hoops v. Tate, 1951, 104 Cal. App.2d 486, 487, 231 P.2d 560; Sharpe v. Arabian American Oil Co., 1952, 111 Cal.App.2d 99, 102, 244 P.2d 83. See also Williston on Contracts, vol. 5, § 1293.

■ In both the 1937 and 1948 contracts involved herein, the parties contracted with respect to a number of different and separate rights, using separate and distinct phrases which apparently seemed apt to the parties at the time, to separately designate those rights. The subject matter of those rights was (1) photography and reproduction of the artist's "acts, poses, plays and appearances"; (2) ownership of the products of that photography; (3) use of the "name, voice and likeness" of the artist in advertising and exploiting the products of the photography; and (4) use of the "name, voice and likeness" of the artist in advertising commercial products other than the products of the photography. Each of these matters is separately provided for, and the terminology, as above indicated, is consistently used so as to maintain the distinction. Taking the instruments as a whole, it seems clear to us that "acts, poses, plays and appearances" has reference to the activities of the artist in connection with the motion pictures which it was the main purpose of these agreements to facilitate; whereas "name, voice and likeness" has reference to non-motion picture reproductions of characteristics of the artist, which last said

666

reproductions themselves are valuable because of the notoriety of the artist and his great public following. But express restrictions upon the producer in his use of any particular right cannot by subsequent implication be read into separate and distinct rights as a restriction upon them.

We are not called upon to delineate the nature of the restrictions upon appellants' use of the artist's "name, voice and likeness" (according to the meaning herein indicated) in commercial advertising. Those limitations are not in dispute once we distinguish the subject matter to which they apply from appellants' rights to the artist's "acts, poses, plays and appearances." We are called upon to settle the uses, at least in part, which appellants may make of the motion pictures containing appearances of the artist, which are owned by appellants. Appellee, the artist, was paid full measure for his services in creating these films, and has specifically relinquished "all rights of every kind and character whatsoever in and to the same * * * perpetually." We are bound to give effect to the meaning of that agreement, that grant, and are bound not to cut it down by implication from another grant unless it is necessary to the effective operation of the contract. Tanner v. Title Ins. & Trust Co., supra. We therefore hold that appellants may exercise their ownership and rights to the product of artist's employment, whether or not such exercise involves exhibition of the subject motion pictures in connection with commercial advertising. The restrictions which involved advertising were restrictions upon the use of artist's "name, voice and likeness," not upon appellants' use of artist's "acts, poses, plays and appearances" or the product thereof.

The fact that artist's name, his voice, and his likeness are contained in and throughout the motion pictures in which he appears is superficially confusing. That is why it is necessary to read the whole of the contracts, and read each part in relation to the other parts. Kohn v. Kohn, supra; Miranda v. Miranda, supra. Upon such reading, it very soon becomes clear that the words are used definitively, and that the distinction hereinbefore set forth was clearly contained in the agreements.

█ A number of additional issues have been raised in this case, all of which are predicated upon an interpretation of the contracts at variance with the meaning as stated herein. If the unlimited grant to appellants of the product of the appellee's services were limited by the subsequent references to advertising uses of appellee's name, voice and likeness, then appellants might be further or otherwise limited in the use of appellee's name, voice, or likeness by waiver or estoppel. But since the two sets of rights are distinct, any waiver or estoppel as to the latter cannot affect the former. Whether the proposed use of the motion pictures by appellants would be unfair competition with appellee if the agreements were silent with respect to appellants' rights, or if the agreements reserved or granted to appellee rights to the motion pictures or advertising uses of them, are questions no longer an issue. Appellee having expressly consented to the proposed use by appellants, he cannot now contend that appellants' use will be unfair competition with him. Vargas v. Esquire, Inc., 7 Cir., 164 F.2d 522, 526–527; Lillie v. Warner Bros. Pictures, 139 Cal.App. 724, 728, 34 P.2d 835; R. C. A. Mfg. Co. v. Whiteman, 2 Cir., 114 F.2d 86, 90.

It follows that the judgment of the lower court must be reversed and the cause remanded with directions to enter judgment for defendants.