Henry Epstein, J.
Plaintiff is the widow and executrix of the late Glenn Miller, well-known orchestra leader and musician. Miller died in 1944 while in military service. For some years prior to his entry into war activities Miller had created original arrangements of musical selections, had developed a well-known style and performance associated in the public mind with his own name — Glenn Miller. From 1938 to 1944 these musical performances grew rapidly in popular favor. In 1939 and 1941 Miller contracted to grant Radio Corporation of America (“ R. C. A.” hereafter) exclusive right to use of his name and likeness in producing advertising and selling phonograph records. This exclusive right covered seven of the eight numbers used in the motion picture “The Glenn Miller Story”. It covered all but a very few numbers played by Miller’s orchestra before he had developed his unique style. The sales by R. C. A. of the individual Miller records of these numbers to the date of the instant action ranged from some 300,000 to over 2 million on all of which Miller, and since his death his estate, have received royalties. Contracts between plaintiff as executrix and R. C. A. have been renewed in the same exclusive form in 1951, and again in 1958, with increasing benefits to' plaintiff. ' Such record sales totalled over 15 million to the date of the complaint herein.
*628 Plaintiff and defendant Universal Pictures Company, Inc. (“Universal” hereafter) on July 24, 1952 contracted for a musical motion picture of the life of Glenn Miller, with a sound track to be developed to duplicate as closely as possible the Glenn Miller arrangements and his own orchestra’s performance of these numbers. Defendants knew of the B. C. A. “ exclusive ” record contract with plaintiff. Defendant Decca Becords, Inc. knew of the film contract between plaintiff and Universal. Decca owns and controls and at the time covered by this controversy owned and controlled Universal. The president of Universal, Milton Backmil, was and is president of the parent Decca. Plaintiff, pursuant to the contract, furnished to Universal scores, transcriptions, orchestrations and electrical transcriptions, instrumental parts, etc. of the Glenn Miller orchestra for utilization in the picture. For months Joseph Gershenson, the conductor of the synthetic Glenn Miller orchestra for the picture, studied and “ saturated ” himself with the Miller style by “repeated playings and analysings of these recordings”. He gradually procured as associates in the simulated Glenn Miller orchestra at least “ eight instrumentalists from the original Glenn Miller Orchestra; Chummy MacGregor (piano), Boland Burdock (bass), Wilbur Schwartz (alto and clarinet), Bichard Piser (guitar), Babe Bussin (tenor sax), Bubin Zarchy (trumpet), Paul Tanner (trombone) and Jimmy Priddy (trombone).” With sedulous practice this group sought to achieve its goal, the precise duplication of the original Glenn Miller orchestra, a band which ‘ ‘ had a sound like no other * * * with a clarinet carrying the melody in unison with a single tenor saxophone — each instrument playing the tune an octave apart — while the other saxophones supply the divided harmonies * * * a sound which no band has ever surpassed ’ ’. Universal issued a brochure in which it stressed the sale of £ ‘ more than 15,000,000 Glenn Miller records * * * when juke box sales hit $150,000,000 * * * one coin out of every three went for a Miller record ”.
The audiences for the renewed Glenn Miller recordings are described by Universal as the “ 1939 ” group of teen-agers, “now in their twenties to early forties” and the “ 1953 ” audiences, teen-agers, who include Glenn Miller’s music as their favorite and who are again to be inoculated with the charm of “ Tuxedo Junction”, “Pennsylvania 6-5000” and “Little Brown Jug ”. These and many other features were poured out in advertising, pamphlet and story form by Decca for its records and Universal for the picture £ £ The Glenn Miller Story ’ ’. Decca advertised the records as “ exact duplications of some of the *629 most famous Glenn Miller hits ”. Decca exploded its superlatives in promoting the synthetic records in its appeal in these words: ‘ ‘ Millions of people will see and love this picture! They will want The Great Miller ‘ sound ’ from this picture! Only THE DEOOA RECORDS TAKEN FROM THE ACTUAL FILM CAN GIVE THIS sound.” The claim of defendants that the Decca record album of Glenn Miller numbers from the picture was primarily intended as a medium for exploiting the picture is wholly nullified by the testimony and evidence in the case. That claim is shown to be a pretense whereby Decca obtained or took from its wholly controlled subsidiary, Universal, a most valuable product available otherwise solely through R. C. A. records. Let it here be noted and stressed that in the Universal contract with plaintiff there is not once that the word “ record ” or “ records ” is used and yet there is full cognizance of the exclusive R. C. A. record contract. Decca and Universal contracted for records by Decca from the picture “ sound track ” intended for use in “ promoting ” the picture. Universal actually granted Decca unlimited commercial phonograph record rights, ivhich plaintiff never gave in the film contract, and which she was powerless to grant. Decca and R. O. A. were and are competitors in the record business. The evidence reveals that R. C. A.’s original Glenn Miller recordings were exhibited in many places, both in the U. S. A. and abroad, together with the Decca recordings from the picture sound track. This court, with the consent of both sides, not only listened to the R. C. A. and Decca recordings in the courtroom on a good phonograph — -but after court in a private home to the same numbers on an excellent ‘ ‘ Hi-Fi ’ ’ set. The court noted the louder sound of the telephone bells in “ Pennsylvania 6-5000 ’ ’ as produced in the sound track record and the variations in the drums and other sounds in the other sound track numbers. Yet, at least for this court, there is no superiority evidenced in the slight variations from the R. O. A. originals. If anything, this court is of the opinion that the original Glenn Miller recordings by R. C. A. are superior —at least in the high fidelity reproduction when played- — to the sound track. That the sound track records seek to and do achieve precise simulation of Glenn Miller’s original orchestra, a goal which was diligently sought, is unquestioned.
There is no doubt that the Universal picture was successful and that the sound track album was indeed a simultaneous financial success to Decca. There is also no doubt that R. 0. A.’s “ memorial album ” of the Glenn Miller records, issued at the same time, was a financial success. Plaintiff’s substantial returns from the picture (over $650,000), and her increased *630 royalties from sale of R. C. A. records (from some $20,000 in 1944, the year of Glenn Miller’s death, to $247,000 in 1954) cannot be regarded as an argument against her claim ag-ainst defendants Decca and Universal. The wealth of the victim grants no reprieve to the pickpocket. Testimony and evidence of other film contracts and phonograph recordings as part of the promotion planned for a musical picture production do not assist in the resolution of the instant case where the facts, known to defendants at the time, preclude any conclusion other than a purposeful taking of a valuable property to plaintiff’s damage. The fact, stressed in defendants’ brief, that “ The Glenn Miller style ” is “ a part of our common musical heritage ” adds nothing to the defense on the facts revealed in this case. Defendants’ brief also states that “ Mr. Gershenson will testify at the trial, and will show that the manuscripts were substantially useless ”. He did not testify nor was any explanation offered. His deposition was read and does not offer much to the defense except to show that the study of Glenn Miller’s original recordings was painstaking. If anything, this adds strength to plaintiff’s charge that the Glenn Miller recordings were in truth pirated. We may search the Universal-Miller contract for the picture in vain for the Decca-claimed right to record the simulated Glenn Miller hit tunes. Paragraph (1) of the contract authorizes Universal to “ portray or represent ” Glenn Miller, his wife ‘ ‘ and/or your children ’ ’ etc. in photoplays and productions. Plaintiff agreed (par. 3) to make available everything necessary for the “ preparation and production of said photo-play ”. This included “ all of Glenn Miller’s musical compositions, arrangements and orchestrations * * * as well as the right to use or simulate the style, manner and manner of playing of Glenn Miller and/or his orchestra ”. Nothing of “records” or “recordings” here. Universal is released of claims based on piracy in the advertising or exploitation of the photoplay (par. 5). Defendants place their strongest emphasis on paragraph 12 of the contract. If not found therein, defendants’ case completely falls.
Paragraph 12 reads: ‘ ‘ Without limiting the rights elsewhere herein granted to us, it is further understood and agreed that the following rights are included in the rights herein granted to.us to be exercised, however, only in connection’with and for the purpose of advertising any photoplay or photoplays or other productions hereunder ’* * * the right to use excerpts from said photoplay or photoplays or other productions hereunder or from the material upon which the same are based in heralds, booklets, programs, posters, lobby displays, press books *631 and all other media of advertising and publicity including, but not limited to, commercial tie-ups.” (Emphasis supplied.)
Neither the “ musical materials ” referred to in paragraph 3, nor the commercial tie-ups of such ‘ ‘ materials ’ ’ referred to in paragraph 12, could be construed to authorize the piracy of E. C. A. recordings and their marketing under Decca’s insignia without E. C. A.’s knowledge and consent. Plaintiff and her counsel were meticulous in the care taken to remove every basis for such a claim by Universal. The contract is explicit in its grant of the use of the “ musical materials ” of the Miller estate. Yet it preserves a silence wholly understandable with respect to recordings. The phonograph records of E. C. A. of course were no part of the properties granted to Universal for the picture and could not have been correspondingly granted to Decca by Universal. Advertising and publicity in printed media are obviously within paragraph 12, but an album by Decca, a competitor of E. C. A., could not by any stretch of construction be regarded as a “ tie-up ’ ’ such as combination with products as shoes, food or other commodities. The sound track is clearly not “ advertising material” which can be translated into an unlimited phonograph record right by another company, a right never given by plaintiff in the film contract and which she could not grant. Nor can we find any warrant for defendants’ action in paragraph 4 of Exhibit A to the agreement, giving defendant Universal “exploitation and marketing of said photoplay”. Defendants’ brief concedes that “Decca’s primary interest in releasing the records (putting aside its interest in Universal itself) was to make a profit for itself. Decca’s business was to sell records ” — and it is in this frank confession, combined with Eackmil’s action and decision as president of both defendants that we find the motivation for the piracy indulged in.
Throughout this case the repeated emphasis on Glenn Miller, Glenn Miller’s “hit tunes”, Glenn Miller’s genius, etc. establishes the purpose of Decca’s wholesale advertising and sales promotion of the records of the hit tunes from the picture. It would take a most discerning purchaser to look for the name of Gershenson or ask the true origin of the recordings. The former teen-agers and the new generation of teen-agers, at whom the picture and the songs were aimed, would not be so likely to make the distinction. ‘ ‘ Glenn Miller ’ ’ and the ‘ ‘ Glenn Miller music ’ ’ were the attractions. The meticulous care to reproduce his hit songs, with the prominence to his name — these were the essentials of the sharp practice indulged in by defendants. And their action was taken after prompt warning and full knowledge of the risks defendants were taking. Plain *632 tiff gave ample warning. Defendants undertook to consult counsel and held conferences. Their defendants’ common president made the final decision. R. C. A. is not in this suit. We do not know, nor can plaintiff he held responsible for what defendants have done to infringe on R. C. A. ’s rights under the latter’s exclusive contract with plaintiff. But whatever defendants have done which would deprive plaintiff as executrix of the Glenn Miller estate, and his children, of the benefits which flow from such recordings and the receipts from sales of these recordings, they must be held accountable for.
A careful study of the many cases cited in briefs of counsel lead this court to the conclusion that the facts in this case warrant an accounting by defendants to plaintiff as executrix.
Metropolitan Opera Assn. v. Wagner-Nichols Recorder Corp. (199 Misc. 786, affd. 279 App. Div. 632 [1st Dept., 1951]) may be considered first. There, as here, an exclusive right to make phonograph records under a particular trade name was involved. Substantial royalties were paid and a substantial minimum was guaranteed. There defendants, like Decca here, had little expenditure involved to produce the records. That case stands for the holding that the owner of musical performances can prevent unauthorized reproduction on phonograph records and that the common-law property right is not lost by a public performance or radio broadcast. Nor is it necessary to show competition between records of the defendant and the contract licensee of recordings. It is the unique quality of the performance and plaintiff’s primary property in that performance which constitute the basis for the action.
In the same vein we find support of plaintiff’s position in: Capitol Records v. Mercury Records Corp. (221 F. 2d 657); Gieseking v. Urania Records (17 Misc 2d 1034) ; International News Service v. Associated Press (248 U. S. 215, 241); Dior v. Milton (9 Misc 2d 425).
Under the principles established by these cases plaintiff becomes entitled to the relief sought without the need to prove the palming off, the competition with income producing media of like character to the damage of plaintiff, etc. In the case at bar Universal was not granted an unlimited license. The agreement of July 24, 1952 was limited and does not include commercial phonograph record rights. The granting clauses of the agreement are decisive. They grant 4 4 motion picture rights ’ ’, 44 television and radio rights ”, but not phonograph recording rights. Thus this contract differs clearly from that involved in Beecham v. London Gramophone Corp. (104 N. Y. S. 2d 473). *633 Yet there the court noted that plaintiff might prove “ that Decca entered into the licensing arrangement with British Lion in bad faith or for the purpose of wrongfully misappropriating the benefits accruing to the plaintiffs from an exclusive recording contract previously made with Columbia” (p. 477). These words have an ominous sound when reflected in the instant background. Nor can defendant Universal escape the obligation, inherent in a limited license contract, not to harm the licensor or deprive her of the benefits otherwise available to her by misusing its grant to lessen her income from other sources in the field (in this case from R. C. A.). A negative covenant will be read into contracts to protect the innocent party from overreaching adversaries. (Harper Bros. v. Klaw, 232 F. 609, 613; Herne v. Liebler, 73 App. Div. 194; McCord v. Broadcast Music, 89 N. Y. S. 2d 772; Lillie v. Warner Bros. Pictures, 139 Cal. App. 724; Madison Sq. Garden Corp. v. Universal Pictures Co., 255 App. Div. 459, 467; April Prods. v. Harms, 165 Misc. 883, affd. 254 App. Div. 728.)
It is familiar law “ that in every contract there exists an implied covenant of good faith and fair dealing.” (Kirke La Shelle Co. v. Armstrong Co., 263 N. Y. 79, 87.) We do not find any contrary principle espoused in Republic Pictures Corp. v. Rogers (213 F. 2d 662 [C. C. A. 9th]), or in Tanner v. Title Ins. & Trust Co. (20 Cal. 2d 814) —cited by defendants. This is not a case where the law extends “ protection to the name of a deceased individual as an individual ’ ’; nor is this a case of ‘ ‘ defamation of the dead ’ ’; nor is it parallel to Schumann v. Loew’s Inc. (135 N. Y. S. 2d 361); nor do the facts herein warrant the citation by defendants for support of Lunceford v. Wilcox (88 N. Y. S. 2d 225) or Coffey v. Metro-Goldwyn-Mayer Corp. (160 Misc. 186). This is not a case of imitation, as was Chaplin v. Amador (93 Cal. App. 358); or Supreme Records v. Decca Records (90 F. Supp. 904 [S. D. Cal., 1950]).
When this case was instituted a temporary restraining order was vacated by Justice Dineen in 1953. But his language shows how clearly the facts upon this trial and the brief of Decca hereinbefore quoted were concealed from him. He points out how the “ imitations ” of Glenn Miller were successful and then says: “ Whether or not defendant Universal had knowledge of plaintiff’s contract with R. C. A. is of no consequence, since the sale of the record album is to be used only for advertising purposes which were granted to it not in competition with R. C. A.” (Emphasis supplied.) (Miller v. Universal Pictures Co., N. Y. L. J., Nov. 16, 1953, p. 1103, col. 5.) Compare this remark of *634 Justice Dineen with defendants’ brief’s flat statement: “ Of course, Decca’s primary interest in releasing the records * * * was to make a profit for itself.”
Since the facts established upon this trial warrant judgment for plaintiff, the question of damages must be considered. Defendants Universal and Decca combined to deprive plaintiff as executrix of the Glenn Miller estate of income. Defendant Decca had no legal right to market the records of Glenn Miller tunes from “ The Glenn Miller Story” picture. Decca made substantial profits from that wrongful act. Decca by control of Universal took unto itself a valuable product in violation of Universal’s contract with plaintiff and in violation of plaintiff’s contract with R. C. A. Religious duplication of R. C. A. records and flagrant utilization of Glenn Miller’s name and high repute were the essence of the wrong done by both defendants to plaintiff as executrix. This court places little weight in the testimony of the defendants’ witness Simonelli on whose weak shoulders it was sought to place the origin of the suggested use by Decca of the records for promoting the picture. Plaintiff at most could have recovered the royalties, had R. C. A. been the beneficiary of the Decca recordings sold. It would therefore seem appropriate to confine plaintiff’s recovery to the royalties from defendants Decca and Universal on the same basis as royalties from R. C. A., i.e., on all records from the sound track of “ The Glenn Miller Story ” sold by Decca or Decca and Universal.
Defendant Decca has wrongfully profited by misappropriating property of plaintiff executrix. Defendant Universal enabled defendant Decca to profit in violation of Universal’s contract with plaintiff executrix. This is an action in equity and equity should at least enable plaintiff as executrix to recover for herself and her children the benefits which the estate would have derived from royalties under the R. C. A. contract. Decca’s wrong can be in part righted by applying the standard indicated. (Westcott Chuck Co. v. Oneida Nat. Chuck Co., 199 N. Y. 247, 251; Hamilton-Brown Shoe Co. v. Wolf Bros. & Co., 240 U. S. 251, 259; Winifred Warren, Inc., v. Turner’s Gowns, 285 N. Y. 62, 67-68.)
This court believes that the damages might well be extended to the profits derived by defendant Decca from its sale of the recordings in question. That would be a far larger sum than the royalties on the records. Yet it might be fully justified under the facts. On the other hand, it would seem harsh to enrich the estate so far beyond what it might recover on the royalty basis. Added to this consideration is the unknown factor of R. C. A. and Decca and the absence of R. O. A. from this *635 litigation. Plaintiff has much to add to her plea: Her continuing interest in E. C. A. sales; her business in the new orchestra carrying the Glenn Miller name; her reversionary rights under the E. C. A. contracts. Plaintiff’s recovery may be as broad as defendants’ profits. (Howard Dustless Duster Co. v. Carleton, 244 P. 881, 882; Dad’s Root Beer Co. v. Doc’s Beverages, 193 P. 2d 77, 83.)
Plaintiff has adequately established her right to an accounting. In order that the accounting may be all-embracing, it is directed that the accounting report the profits made by Decea on its sales to date of the records sold from ‘ ‘ The Glenn Miller Story” and also the royalties payable on said sales, based on the royalty basis of the contracts between plaintiff and E. C. A. In the light of this determination no injunction will issue.

There must come a time when “ the morals of the market place ” should approximate those standards measured in terms of common honesty. In determining cases the courts have a responsibility which does not always require the necessity of statutory relief. Equity has that poiver and this is such a case.

Parties having waived findings of fact and conclusions of law, the above constitutes the decision in this case.
Judgment for plaintiff as executrix to the extent indicated. Settle judgment, allowing for direction for accounting.