**The CHIC ORGANIZATION, LTD., Plaintiff,**

v.

**MOTOWN RECORD CORPORATION, Defendant.**

**No. 82 Civ. 3456 (WCC).**

United States District Court, S.D. New York.

March 23, 1984.

---

Silfen & Glasser, P.C., New York City, for plaintiff; Martin E. Silfen, Jeanne A. Glasser, New York City, of counsel.

Finley, Kumble, Wagner, Heine, Unterberg, Manley & Casey, New York City, for defendant; Philip S. Kaufman, Andrew Squire, New York City, of counsel.

## OPINION AND ORDER

CONNER, District Judge:

This is an action for breach of a written contract between plaintiff The Chic Organization, Ltd. ("Chic") and defendant Motown Record Corporation ("Motown"), under which Chic was engaged to produce a record album to be performed by Diana Ross ("Ross"), and was granted an option to produce a second Ross album if the first album surpassed a certain level of sales. Following the successful production and release of the first album contemplated by the contract, Chic exercised its option. Unfortunately, the option album was never recorded. In fact, since the release of that first album, Ross has not made any additional recordings for Motown, and she is now under contract to RCA Records ("RCA").

Plaintiff commenced the instant action seeking damages for Motown's alleged liability for non-performance as to the option album, and also to collect certain royalties relating to the first recording that it claims are still due under the contract. Prior to trial, the claim for amounts due was settled pursuant to a stipulation read into the record. *See* tr. at 2–5. At the same time, defendant withdrew a counterclaim it had asserted in this action. *See id.* at 5. On September 26, 1983, the question of Motown's liability under plaintiff's first cause of action, which relates to the option album, was tried before the Court, sitting without a jury. This Opinion and Order incorporates the Court's findings of fact and conclusions of law pursuant to Rule 52, F.R.Civ.P. For the reasons stated below, judgment will be entered in favor of defendant dismissing plaintiff's complaint.

### I.

Most of the facts underlying this action have been stipulated by the parties, and the few that have not can be set forth without extended discussion:

Chic is a New York corporation engaged in the business of producing musical recordings. Agreed Facts at ¶ 1. In that operation, Chic provides the services of Nile Rodgers ("Rodgers") and Bernard Edwards ("Edwards"), both principals of the corporation, to perform the actual production of the recordings. In approximately June of 1979, Martin Itzler ("Itzler"), Secretary and General Counsel of Chic, initiated discussions with Motown concerning a proposed project for Chic's production of a recording of a performance by Ross.

Agreed Facts at ¶¶ 2, 5; tr. at 18–19, 24. Between June and August of 1979, Itzler had a series of telephone conversations concerning the proposed project with various representatives of Motown, including Suzanne DePasse ("DePasse"), Lee Young, Jr. ("Young"), Lee Colton ("Colton"), and Robert Rosene ("Rosene"). Agreed Facts at ¶ 6; tr. at 25–26.

On the basis of these discussions, Rosene, on August 8, 1979, sent Itzler a proposed agreement between Motown and Chic, pursuant to which Rodgers and Edwards would produce a recording of Ross. Agreed Facts at ¶ 7; tr. at 26–27; see Pl. Exs. 8–9. Paragraph 11(A) of the proposed agreement provided Chic with an option to produce Ross's next album, so long as net domestic wholesale sales of the first recording exceeded $1,000,000. See Pl. Ex. 9 at ¶ 11(A). Itzler scrutinized this first draft and made extensive revisions, which he then discussed with Motown's representatives. Agreed Facts at ¶ 8; see tr. at 27–29; Pl. Ex. 9 (handwritten markings reflect Itzler's changes). Motown then prepared and sent to Itzler a second draft of the proposed agreement, which reflected the changes agreed to by Itzler and Motown's representatives during their negotiations. Agreed Facts at ¶ 9; see tr. at 29–30; Pl. Exs. 10 (red-lined copy) and 11.

When Itzler received this second draft he found that, in addition to the changes he had discussed with Motown's representatives, it failed to provide Chic with an option to produce a second album. See tr. at 34–35. According to what Itzler was told by Motown, the option was unilaterally deleted because Motown was not sure that Ross would go along with it. See tr. at 36. Nevertheless, Itzler engaged in further discussions with Motown's representatives and they succeeded in agreeing upon a third and final draft of the agreement, in which they reinstated a modified option provision.[1] See tr. at 38. On August 28, 1979, Rosene sent Itzler a copy of that final draft. Agreed Facts at ¶ 11; see Pl. Ex. 12. Chic, Rodgers, and Edwards executed that version of the agreement, which was forwarded on August 30, 1979 to Motown for signature. Agreed Facts at ¶ 12; see Pl. Ex. 13. Colton, Vice President and General Counsel of Motown, signed the document on behalf of defendant, and on September 7, 1979 he sent Itzler a fully executed copy of the agreement (the "Chic/Motown Agreement"). Ross, however, was not a party to this contract.

On November 5, 1979, Rodgers and Edwards began studio production of the initial recording called for under the Chic/Motown Agreement. Agreed Facts at ¶ 14. The production work was completed by approximately the beginning of April 1980, and the recording, which was ultimately entitled "Diana," was released on May 22, 1980. Agreed Facts at ¶ 15.

On October 10, 1980, Itzler sent a letter to Young to advise Motown that Chic was exercising its option under ¶ 11(A) of the Chic/Motown Agreement to produce "one of the next two" albums recorded by Ross for Motown. Agreed Facts at ¶ 18; see Pl. Exs. 17A, 17B. In a letter dated October 27, 1980, Motown acknowledged receipt of Itzler's letter and stated:

> Current evidence supports the conclusion that your option was validly exercised. Inasmuch as there are no present plans with respect to producing the "next" Diana Ross album, we are unable to indicate which album we might wish you to produce.

---

1. That option provision, which is incorporated at ¶ 11(A) of the parties' agreement, provides in part:

> If sales of the LP hereunder exceed one million units sold (*i.e.*, shipped and not returned) through normal retail channels in the United States, producer shall have the option to produce one of the Artist's next two (2) albums, provided that you give written notice to [Motown] within six (6) months after the release date of the LP to be produced hereunder that you elect to exercise such option. Within five (5) business days after receipt of such written notice [Motown] shall advise you in writing of whether or not the LP has sold sufficient units, (taking into consideration anticipated returns) to validate your option exercise and as to which of the next two (2) albums [Motown] desires to have you produce.

Pl. Ex. 15 at ¶ 11(A).

Pl. Ex. 18. Motown does not now dispute that the option was properly exercised. *See* tr. at 150.

As it turned out, subsequent to her recording of "Diana," Ross refused to record another album for Motown. Agreed Facts at ¶ 20. Although at the time the parties entered into the Chic/Motown Agreement Ross was bound to Motown under an exclusive personal services contract dated December 24, 1973 (the "Ross/Motown Contract"), Agreed Facts at ¶ 4; *see* Pl. Ex. 1, that contract, which had a term of seven years, expired on December 23, 1980. *See id.* Moreover, even before that contract expired, following the "Diana" album, Ross refused to make any additional recordings for Motown until Motown reached a new agreement with her. *See* tr. at 145. Although Motown made reasonable efforts to get Ross both to re-enter the studio and to agree to a new contract, those efforts proved unsuccessful. *See* tr. at 140–48. Ultimately, on May 12, 1981, Ross entered into a recording contract with RCA, and has since released two albums on the RCA label. Agreed Facts at ¶¶ 22–23.

## II.

Stripped of its famous names and glamorous subject matter, the instant dispute involves a rudimentary question of contractual interpretation, made possible only because the underlying agreement suffers from one of the most basic flaws known to the art of contract drafting: the parties failed to provide explicitly for the occurrence of a contingent event which, unfortunately for both Chic and Motown, ultimately transpired. Contrary to both parties' obvious expectations, Ross refused, following the "Diana" album, to continue to record for Motown.

Chic now claims that the Chic/Motown Agreement is unambiguous and contains an implied, unconditional promise on the part of Motown to deliver Ross for two albums. Motown also contends that the Chic/Motown Agreement is unambiguous; however it asserts, not surprisingly, that the contract contains no such promise.

The parties agree that pursuant to § 26 of the Chic/Motown Agreement, California law governs the resolution of this controversy. Under California contract law, "[t]he language of a contract is to govern its interpretation, if the language is clear and explicit, and does not involve an absurdity." Cal.Civ.Code § 1638 (West 1973). Moreover, when a contract is reduced to writing, the court must attempt, if possible, to ascertain the parties' intent from that writing. Cal.Civ.Code § 1639 (West 1973). The contract must be viewed as a whole, giving effect, to the extent reasonably practicable, to every part and using each clause to help interpret the others. Cal. Civ.Code § 1640 (West 1973). However, in instances where the terms of a contract are ambiguous or uncertain, they should be interpreted most strongly against the party who caused the uncertainty to exist. Cal. Civ.Code § 1654 (West 1973). Summarizing these rules, the Ninth Circuit has stated:

> [T]hese rules apply: (1) the interpretation to be given a contract is determined as a matter of law solely from the instrument itself if that can possibly be done without making any part of the instrument nugatory, or reaching an absurdity, an appellate court is free to adopt its own construction ...; (2) the contract must be taken by its four corners, and read so as to effectuate every part, if that may reasonably be done ...; (3) and particularly, courts are loathe to impose limitations or restrictions upon the parties which are not expressly contained in their agreement or which do not arise by necessary implication, and without such implied restrictions the contract could not be effectively performed.

*Republic Pictures Corp. v. Rogers*, 213 F.2d 662, 665 (9th Cir.1954).

Applying these principles to the instant dispute, it is clear that the Chic/Motown Agreement is not susceptible of the interpretation proffered by plaintiff. As an initial matter, ¶ 25 of the Chic/Motown Agreement contains an integration clause, which provides in part that:

This Agreement sets forth the entire agreement between you, [Chic] and us [Motown] with respect to the subject matter hereof. You acknowledge that you have not executed this Agreement in reliance on any representation or warranty made by us or any of our representatives, agents, or employees other than those expressly contained in this Agreement. *No warranty by either party other than those expressly set forth in this Agreement shall be implied in the construction of this Agreement.*

Pl. Ex. 15 at ¶ 25 (emphasis added). Unless this clause is to be given no (or selective) effect, in contravention of California's rules of contract construction, plaintiff's argument cannot prevail: Chic is plainly asking this Court to imply an obligation on Motown that is not set forth in the parties' written agreement. However, even if I assume, *arguendo*, that the integration clause is not an impenetrable barrier to the construction urged by Chic, other provisions of the Chic/Motown Agreement demonstrate that plaintiff's interpretation is unacceptable.

Paragraph One of the Agreement provides that:

You [Chic] agree to furnish the personal services of Nile Rodgers and Bernard Edwards (hereinafter referred to as the "Producer") as independent producer of master recordings sufficient to constitute one (1) LP technically satisfactory to [Motown] of the performance of Diana Ross ("Artist") who is under exclusive contract to [Motown] as a recording artist.

Pl. Ex. 15 at ¶ 1. Thus, while Chic undertook the affirmative obligation to furnish the services of Rodgers and Edwards, Motown did not explicitly undertake such a duty with respect to Ross. More importantly, in ¶¶ 15(b) and (c) of the Chic/Motown Agreement, plaintiff expressly warranted that Edwards and Rodgers had existing contracts with Chic that would enable them to fulfill their obligations under the Chic/Motown Agreement, and that those contracts would remain in full force

and effect for the term of the Chic/Motown Agreement. Pl. Ex. 15 at ¶¶ 15(b) and (c). Edwards and Rodgers also personally signed the Chic/Motown Agreement, thereby agreeing "to perform in accordance with and to be bound by the Agreement insofar as the Agreement relate[d to each of them]." Pl. Ex. 15 at 16.

By contrast, there exist no similar provisions in the Chic/Motown Agreement concerning a corresponding undertaking on the part of Motown. Nowhere in the Agreement does Motown expressly warrant that it will keep Ross under contract for the duration of the Chic/Motown Agreement. Motown warranted only that Ross was under exclusive contract to it at the time the Agreement was signed, *see* Pl. Ex. 15 at ¶ 1, not that it would maintain that status or that it would be able to compel her to perform. While Motown's promise in this situation is reasonably susceptible of the interpretation that Motown would make good-faith efforts to make Ross available for the recordings contemplated by the Chic/Motown Agreement, it simply does not make Motown the guarantor of Ross's performance. To the extent that Motown was under a good-faith duty, it clearly made diligent, albeit unsuccessful, efforts to persuade Ross to return to the studio when there was still time remaining on the Ross/Motown Contract, and to sign Ross to a new contract to extend past December 23, 1980. *See* tr. at 140–48.

Moreover, unlike Rodgers and Edwards, Ross was not a signatory to or in any way bound by the Chic/Motown Agreement. Indeed, although the entire Chic/Motown Agreement was premised upon the cooperation of Ross, Chic never requested at any time during the negotiating process that Ross personally sign the Agreement. *See* tr. at 95–96.

Nor can it be said that Chic failed to understand the difference in the nature of the obligations these provisions imposed upon each side at the time the Agreement was entered into. This was not a form contract imposed upon plaintiff against its will. Rather, the Chic/Motown Agreement

was a fully negotiated document that went through three drafts before it was acceptable to both parties. It was negotiated on behalf of Chic by Itzler, who besides. being an officer of plaintiff is also an attorney possessing an expertise in the area of entertainment law. *See* tr. at 82. Although Itzler is a member of only the New York Bar, he is generally familiar with California law and had in the past negotiated contracts governed by the law of California. *See id.* Itzler testified that he fully understood that Chic was representing that Rodgers and Edwards would continue to be under contract to Chic for the term of the Chic/Motown Agreement, but that Motown was not giving a similar representation with respect to Ross:

> Q. That's right. But nevertheless, Chic represented in the contract, whether or not it was enforceable, that Rodgers and Edwards would continue to be under contract to them for the term of this agreement. Isn't that what that says?
> A. Yes.
> Q. And isn't that what it meant to you?
> A. Yes.
> Q. However, Mr. Itzler, on the other hand, Motown gave no such representation to Chic in this contract, did it?
> A. Diana Ross was not an employee of Motown.
> Q. Whether or not she was an employee, they gave no such representation, did they?
> A. No—they didn't give that same representation, no, they didn't.

Tr. at 95.

What plaintiff is asking this Court to do is to impose upon Motown an implied, unconditional promise to deliver Ross for up to two albums, in much the same way that Chic explicitly undertook a duty to ensure that Rodgers and Edwards would be available for the entire term of the Agreement, but in the absence of corresponding language in the contract imposing that duty upon Motown. However, to find that the Chic/Motown Agreement contains by implication a provision of the same type that appears explicitly elsewhere in the contract runs counter to the rules of contract construction. The presence of similar warranties within the same document compels the conclusion on this record that if the parties had intended that Motown have an unconditional obligation to ensure Ross's availability, they would have stated so explicitly.

The Court realizes that Chic never contemplated at the time it entered into the Chic/Motown Agreement that Ross would ever leave Motown. As Itzler directly stated in response to a question from the bench: "Well honestly, Judge, it didn't even occur to me." Tr. at 37. And, as he further explained:

> Q. Was it known at all was it rumored in the industry as to what the term of [the Ross/Motown] contract was?
> A. The term of Diana Ross' life.
> Q. Is that what your understanding was, that the agreement was for the rest of Diana Ross' life?
> A. She started as a child and like Stevie Wonder and all the other Motown people out of the original Motown and everyone assumed it was going on forever, yes.
> Q. Is that what you assumed?
> A. Yes.
> Q. That it was infinite in duration?
> A. Yes.

Tr. at 87 (adopting testimony from March 31, 1983 deposition). However, despite the mystique that may surround the Motown roster of performers, and the presumed loyalty of the stars who grew up with the record company, Chic is surely charged with notice of § 2855 of the California Labor Code which limits the duration of personal service contracts to seven years. *See* Cal.Lab.Code § 2855 (West 1971).

Since Ross's presence was so fundamental to the success of the projects contemplated by the Chic/Motown Agreement, it is incredible to me that Chic never once inquired as to the terms of Ross's ties to Motown. *See* tr. at 37–38, 86. Nevertheless, plaintiff's absence of foresight cannot be used by the Court as a basis for rewriting the bargain struck by the parties. Here, under the unambiguous terms of the

Chic/Motown Agreement, Motown did not unconditionally guarantee the availability of Ross for the completion of two albums. Despite plaintiff's protestations to the contrary, no such undertaking can reasonably or properly be implied in this contract.[2]

Because I find the remainder of plaintiff's arguments—including the claim that defendant's response to Chic's exercise of the option was inadequate and the belated claim that Motown defrauded Chic in some manner—to be wholly without merit, I conclude that Motown has not breached the option provision, § 11(A) of the Chic/Motown Agreement. Accordingly, judgment will be entered in defendant's favor dismissing plaintiff's complaint with prejudice and costs. Defendant is directed to prepare and submit a proposed judgment within five days of the date of this Opinion and Order on five days' notice.

SO ORDERED.

---

2. Because of this conclusion, I need not decide whether defendant's performance would be excused by the doctrines of impossibility of performance or frustration of purpose. I should also note, that the Chic/Motown Agreement does contain, at ¶ 21, a force majeure clause, which provides in part:

Neither Producer nor [Motown] shall be deemed in default if performance of obligations hereunder is delayed or becomes impossible by reason of ... strike; nor shall [Motown] be deemed in default if due to any labor controversy or adjustment thereof ....

Pl. Ex. 15 at ¶ 21. Although I do not reach the issue, it is conceivable that this clause would apply to relieve Motown of any liability it would otherwise have for Ross's refusal to perform.