[L. A. No. 17671. In Bank. Sept. 24, 1942.]

GEORGE TANNER, et al., Respondents, v. TITLE INSURANCE AND TRUST COMPANY (a Corporation) et al., Appellants.

Cree & Brooks, Richardson & Jordan, Harold Richardson and Frank C. Charvat for Appellants.

Burke, Hickson, Burke & Marshall, Harry C. Williams and Daniel G. Marshall for Respondents.

EDMONDS, J.—A rather unusual situation in the relations of adjoining landowners has occasioned the present controversy. Each of the parties, or his predecessor in interest, was, at one time, a lessor, with others, under what is termed a community oil lease. In an action to quiet title, brought by the respondents as the owners of two lots from

which oil is being produced, the trial court determined that they are entitled to all of the landowners' royalty, and that the appellants, who are the owners of land which was surrendered by the lessee, have no interest therein. The appellants assert the right to share in the royalties provided for by this lease, and, also, to the entire proceeds of the oil which was discovered upon land owned by them, or their predecessors in interest, after the date of the surrender.

There is no dispute concerning the facts of the case. In 1921, Standard Oil Company leased nine contiguous parcels of land, described as lots, each of which comprises five acres. One Beaty and his wife were then the owners of the westerly one-half of lots 171 and 172 and joined in the lease. Some years later they executed a deed of trust for the benefit of the appellant Whittier Building and Loan Association. Under the terms of an agreement executed by the lessee, the trustors, the trustees and the association, the lease was made subordinate to the deed of trust. In 1934 the beneficiary became the purchaser of the property at a trustee's sale and three years later conveyed it, without reservation. Frank H. Olds and his wife, who are the other appellants, executed the lease as the owners of lot 173. The respondents are, respectively, the owners and lessors of lots 174 and 176.

The lessee drilled two wells, one on lot 174, and the other on lot 176. Oil in paying quantities has been produced from each of these wells for some years.

In 1933, the oil company, by an instrument in writing executed by it and the lessors, surrendered all land included within the terms of its lease except lots 174 and 176. At the time of the surrender, each of the lessors was then participating in the land-owners' royalties accruing under the terms of the lease. This participation continued until the commencement of the present action.

Three years later, the owners of the surrendered lots sued the respondents to quiet their respective titles and in June, 1937, a decree was rendered in their favor. Following the discovery of deeper sand in the Montebello Oil Field in the latter part of 1937, the appellants Olds leased their lot to the Bush Oil Company. Beginning in May, 1939, oil was produced from that lot and was being produced at the time of the trial. Royalties paid to the appellants Olds upon this production up to November 1, 1939, amounted to $13,500.

No part of these royalties has been shared with the respondents. About the same time, and after the conveyance of the westerly half of lots 171 and 172, this land was also leased to Bush Oil Company, which, from 1939 and to the time of the trial of this action has produced oil in paying quantities from it.

As their sole ground for a reversal of the judgment, the appellants rely upon a provision of the lease reading as follows: ''Said Lessors agree to, and they do hereby, pool their interest in this lease, and agree that during the continuance of this lease ecah owner of land subject thereto shall share in all benefits accruing to the whole lease in the ratio which the acreage owned by said Lessors bears to the entire acreage leased. This provision as to apportionment of benefits to be operative, notwithstanding the surrender by the Lessee of any land described herein.'' The respondents contend that the Whittier Building and Loan Association did not acquire any right to share in the royalties by virtue of the subordination agreement executed in connection with the Beaty deed of trust. And conceding, for the purpose of argument, that it did acquire such a right, so they say, the association divested itself of that right by its conveyance of the Beaty land. As against all of the appellants, the respondents urge that the surrender agreement extinguished the rights of the owners of the surrendered lots, including the appellants, to further participation in the community royalties. And as another and alternative ground, they contend that, under a proper construction of the clause relating to the sharing of royalties after a surrender, the owners of the surrendered lots forfeited their rights to participation when, subsequent to the time of the release of their lots, they began producing oil from them and failed to share the royalties derived from that production with their colessors under the community lease.

The distinguishing feature of a lease under which several landowners lease their respective lots as one tract, with the sole and exclusive right to the lessee to drill for and produce oil upon any part of it, is that each owner shares proportionately in the royalties irrespective of the lot or lots upon which oil is discovered. The owners of lots upon which no well is drilled share equally the fruits of the common venture with the lessors whose land proves productive. Also, it is often found that certain lots are either non-productive or cannot be economically used by the lessee. Under those

circumstances it is usual to provide for the withdrawal of such land from the lease in order that it may be devoted to profitable uses. In the event of a release, the rights of the owners of the surrendered lots to continued participation in royalties from production upon the land remaining under the lease must be considered. Accordingly, community oil leases commonly provide for the apportionment of benefits among all owners, notwithstanding the surrender by the lessee of any of the lands subject to the lease.

Such a provision was considered in *First National Bank of Redondo* v. *Standard Oil Co. of California*, 91 Cal. App. 705 [267 Pac. 548]. That case arose after oil was discovered upon lots retained under the lease following the surrender of the non-producing lots. The owners of the producing lots claimed all of the royalties under the lease, asserting that the notice of surrender terminated the lease given by the lessee. The court rejected this contention and decreed that the owners of the surrendered lands were entitled to participate in future royalties. The appellants contend that the principles stated and applied in that case are controlling in the present controversy.

Under California law, the owner of land does not have an absolute title to the oil and gas in place as corporeal real property, but has the exclusive right to drill for them upon his premises. (*La Laguna Ranch Co.* v. *Dodge*, 18 Cal. (2d) 132, 135 [114 P. (2d) 351, 135 A. L. R. 546]; *Dabney-Johnston Oil Corp.* v. *Walden*, 4 Cal. (2d) 637, 649 [52 P. (2d) 237]; *Callahan* v. *Martin*, 3 Cal. (2d) 110, 117 [43 P. (2d) 788, 101 A. L. R. 871].) By the express terms of the community lease now before the court, the landowners "pooled" their interests and agreed that, during its continuance, each of the lessors should share in all benefits accruing thereunder in the ratio which the acreage owned by him bore to the entire acreage leased. Reading the instrument as a whole, it gives no one of the lessors any rights in the land of the others except to share in the oil royalty. Each owner-lessor transferred to the lessee oil company his right to drill for and produce oil and other petroleum products for the term of the lease. The right thus created in the lessee is a *profit à prendre*. (*La Laguna Ranch Co.* v. *Dodge, supra*, p. 135; *Dabney* v. *Edwards*, 5 Cal. (2d) 1, 11 [53 P. (2d) 962, 103 A.L.R. 822]; *Dabney-Johnson Oil Corp.* v. *Walden, supra*, p. 649; *Callahan* v. *Martin, supra*, p. 122;

*Dallapi* v. *Campbell,* 45 Cal. App. (2d) 541, 546 [114 P. (2d) 646]; *Lever* v. *Smith,* 30 Cal. App. (2d) 667, 671 [87 P. (2d) 66].)

The royalty return which the lessee renders to his lessor for a *profit à prendre* in land is analogous to rent, an incorporeal hereditament. (*Dabney-Johnston Oil Corp.* v. *Walden, supra,* p. 651; *Callahan* v. *Martin, supra,* p. 123.) And where the lessor under an oil lease assigns to third persons fractional interests in the royalties which he has reserved to himself, the holder of such an interest also acquires an estate in real property, an incorporeal hereditament analogous to the right to receive future rents. (*La Laguna Ranch Co.* v. *Dodge, supra,* p. 135; *Dabney-Johnston Oil Corp.* v. *Walden, supra,* p. 651; *Callahan* v. *Martin, supra,* p. 124; *Lever* v. *Smith, supra,* p. 671.) By executing the community lease, the respondents and each of the other lessors assigned or conveyed to his colessors a percentage interest in all oil produced on his land by the lessee during the continuance of the lease. The consideration for that transfer was the similar mutual assignments of the other lessors. The royalty interest thus transferred by each landowner to his colessors is an incorporeal hereditament in gross (*Callahan* v. *Martin, supra*) and the grantee's interest in the oil produced upon the property of one of the colessors is entirely separate and distinct from the royalty interest retained by him in oil which might be produced from his own premises. The only connection between the two interests is that the pro-rata assignment by one of the lessors of the royalty from his land is the consideration for the conveyance of the other lessors to him.

Although the cases clearly establish that the percentage of the royalty reserved by a lessor in oil produced from his land passes to a grantee of the fee as an incident of the conveyance (see cases collected in note 94 A. L. R. 660), except as such rights are reserved by the deed, the incorporeal hereditament owned by the grantor in the oil produced from the land of the colessors, existing in gross, obviously does not follow the conveyance of the lessor's land, but can only be conveyed by a specific transfer of that interest. And as neither the subordination agreement nor the trust deed executed by Mr. and Mrs. Beaty purported to transfer to the appellant association their incorporeal hereditament in gross in the oil produced from the land of either Tanner or Hunt, the trial court properly decreed that Whittier Building and

Loan Association has no right, title or estate in or to lots 174 and 176, or in the landowners' royalty in oil produced therefrom.

The stipulation relied upon by the association is not controlling. During the trial, counsel stipulated that it is the successor in interest "as to all [the Beaty's] right, title and interest in the lease, and in and to the real property mentioned by virtue of the trustee's deed." Neither Mr. or Mrs. Beaty is a party to this action, and the association cannot bind them by a stipulation made with others.

The rights of the appellants Olds, however, are governed by the principles followed in *First National Bank of Redondo* v. *Standard Oil Co. of California, supra,* unless it may be said that the surrender agreement of 1933, or the independent oil development by them, terminated their right to the royalties under the community lease. The respondents concede that a mere unilateral surrender by the lessee, as was involved in the Bank of Redondo case, does not terminate the right of the owners of surrendered premises to continue to share in the royalties accruing under the community lease. But the agreement of June 1, 1933, they urge, is not a simple surrender by the lessee, but is a bilateral agreement, executed by the lessee and all of the lessors, for the purpose of terminating the lease as to all of the land except lots 174 and 176, and by its terms foreclosed the appellants Olds, as the owners of surrendered lot 173, from further participation in the community royalties.

This agreement recites that "pursuant to the provisions of said agreement of lease . . . the parties hereto desire to terminate [it] . . . as to all of the lands covered thereby, save and except that portion of said lands hereinafter described, . . ." "In consideration of the premises," the agreement continues, "the parties hereto do hereby mutually agree as follows: The lessee does hereby terminate and surrender all of its right, title and interest in and to said agreement of lease . . . as to all of the lands covered thereby, save and except [Lots 174 and 176] . . . The lessors hereby accept the foregoing termination and surrender . . . and the parties hereto do hereby mutually release and discharge each other from any and all obligations thereunder with respect to all of the lands covered thereby, save and except that portion of said lands hereinabove specifically described. . . ."

According to respondents, the effect of this agreement was

to terminate the entire community lease, including the provision relating to the continued sharing of royalties after a surrender, as to all of the withdrawn lots, including the lot owned by the appellants Olds. Referring to the last provision of the agreement, they contend that when the parties "mutually released and discharged each other from any and all obligations" with respect to the surrendered lands, the appellants thereby released their right to continue to receive a share of the community royalties.

Admittedly this agreement is more than a quitclaim by the lessee since it was executed by all of the parties to the community lease. But its form and terms indicate an intention to affect only the relationship between the lessors, collectively, and the lessee. As to certain lots, the right to explore and drill for oil was terminated, but the rights and obligations of the lessors, among themselves, with respect to the lots remaining under the lease were in no way affected.

In this connection, it should be stated that the surrender agreement was entered into at the request of the lessee. Therefore, it is only reasonable to assume that the contract was intended to relate only to the rights and duties of the lessee and not to the contractual relationship existing among the lessors themselves. The purpose of the lessee in employing the bilateral form of agreement was to eliminate any question which might well arise as to its unilateral contract. In the agreement executed by the parties the lessors together are designated as "the parties of the first part" and the lessee is referred to as "the party of the second part." The agreement recites that it is made pursuant to the lease, which may only be taken to mean that it was executed in accordance with the provision giving the lessee the right to surrender any portion of the premises. And the lease specifically provides that such surrender shall not affect the existing distribution of royalties.

The respondents attach undue significance to the word "terminate". That word is used several times in the lease itself but only in the sense of dissolving the lessee's relationship thereunder. Bearing in mind that the parties making the mutual release are the lessors together on the one part, and the lessee on the other part, the clause of the agreement whereby "the parties" mutually release and discharge each other from any and all obligations under the lease with respect to the surrendered lands, should be interpreted as meaning that the lessee agrees to a discharge of the lessors' obliga-

tion to retain such lots under the lease, and the lessors agree to release the lessee's obligation thereunder.

There is no reasonable basis for construing the provision to mean that the owners of the released lands surrendered their rights as community lessors in the lots retained under the lease. As to those lots, the relationship of the parties continued as before, and the owners of the surrendered lands have the right to participate in all royalties payable under the lease.

However, assuming that there is any ambiguity in the wording of the surrender agreement, such ambiguity must be resolved against the construction contended for by the respondents by reason of their conduct thereunder. From June, 1933, until 1938, when this suit was filed, the owners of the surrendered lands, including the appellants Olds, continued regularly to receive their share of the royalties under the lease, and the respondents at no time voiced any objection to this continued apportionment. In the determination of the meaning of a contract claimed to be indefinite, the interpretation placed upon the contract by the parties themselves, as evidenced by their conduct subsequent to its execution, may be considered. (*Lamm* v. *Stillwater Land Cattle Co.*, 217 Cal. 474 [19 P. (2d) 785].) The present position of the respondents is in direct conflict with their conduct for over five years after the agreement was made. For these reasons, the surrender agreement does not bar the appellants Olds from future participation in the royalties accruing under the community lease.

The respondents also contend that the appellants forfeited their right to share in royalties under the lease by producing oil from their surrendered lot and appropriating all of the royalties therefrom to themselves. The underlying intent and purpose of a community lease, they urge, is that each party shall participate in all of the production from any of the lands in proportion to his holdings, and it would be destructive of this fundamental purpose to permit one lessor to retain all of the royalty from oil produced upon his land and at the same time participate in the royalty payable on account of oil produced from the lands of the other lessors.

The argument would be sound if all of the lands upon which oil is being produced were included in the community lease. But since the surrender agreement was executed, the lots

mentioned in it have not been a part of the land leased to the Standard Oil Company. The owners of these lots, therefore, might devote them to any profitable use. The community lease contains no provision prohibiting the production of oil from surrendered lots, nor that, in the event of such production, the owners of lands retained under the lease are entitled to participate therein. On the contrary, it particularly specifies that the owners of the surrendered lots shall be entitled to share in royalties under the community lease notwithstanding the surrender.

To sustain the respondents' contention, such a limitation would have to be added to the clause providing for continued apportionment. But in the absence of fraud or mistake, the intention of the parties as expressed in the agreement is controlling, and courts are not empowered under the guise of construction or explanation to depart from the plain meaning of the writing and insert a term or limitation not found therein. (*Brant* v. *California Dairies, Inc.*, 4 Cal. (2d) 128 [48 P. (2d) 13]; *Adams* v. *Cook*, 15 Cal. (2d) 352 [101 P. (2d) 484].) The parties might have added a clause under which an owner of surrendered land would have no further right to royalties in the event that oil was discovered upon it. Certainly such subsequent discovery of oil may not be deemed an unforeseen event and therefore without the contemplation of the parties to a community oil lease. Such a lease is executed by the respective parties to it because of their hope or expectation that oil may be found under some or all of the land leased. But as the parties to the contract now before the court did not limit the rights of an owner of surrendered land, a court may not do so upon a claim that, as events now show, it operates unfairly.

True, courts have frequently considered implied covenants as being within a contract but such covenants are justified only when they are not inconsistent with some express term of the contract and, in the absence of such implied terms, the contract could not be effectively performed. (*Williston* on *Contracts*, vol. 5, § 1293; *Jones* v. *Interstate Oil Corp.*, 115 Cal. App. 302 [1 P. (2d) 1051].) But the facts of the present case do not show any basis for implying a covenant in the lease which would have the effect of dividing the royalty provided for in it differently than the parties have agreed upon by the plain terms of their contract.

The respondents would be in an entirely different position

if their suit was based upon pleadings and proof that the appellants Olds, by the production of oil on their land, are draining oil from the pool tapped by the wells on lots 174 and 176, and are thus impeding the full performance of the community lease.

Every contract contains an implied covenant on the part of each party not to prevent or hinder performance by the other party. (*Williston* on *Contracts,* vol. 5, § 1293A.) Upon fundamental principles, the law will not allow one to claim royalties under a community lease and at the same time diminish the amount of oil which might otherwise be recovered for the common benefit of all the lessors.

For example, in *Hartman Ranch Co.* v. *Associated Oil Co.,* 10 Cal. (2d) 232 [73 P. (2d) 1163], the defendant leased plaintiff's oil property and also acquired a lease on adjacent land upon which it drilled wells, thereby draining oil from the plaintiff's land. The lease with the plaintiff contained no offset clause. Nevertheless, the court held that a covenant would be implied obligating the lessee to drill wells to offset those on the adjacent property.

In the present case, however, no evidence was offered to show that the well on the land of the Olds is draining oil from the source of supply under the community lease, and contrary to the contention of the respondents, this court may not take judicial notice of any such alleged fact.

In an action to quiet title, the plaintiff must recover upon the strength of his own title and not upon the weakness of the defendant's claim. (*Valle* v. *Ingram,* 18 Cal. (2d) 761 [117 P. (2d) 869]; *Denman* v. *Smith,* 14 Cal. (2d) 752 [97 P. (2d) 451]; *Coffin* v. *Odd Fellows Hall Association of Modesto,* 9 Cal. (2d) 521 [71 P. (2d) 266]; *Knoke* v. *Knight,* 206 Cal. 225 [273 Pac. 786]; *Rocky* v. *Vieux,* 179 Cal. 681 [178 Pac. 712]; *Sears* v. *Willard,* 165 Cal. 12 [130 Pac. 869]; *Williams* v. *City of San Pedro, etc. Co.,* 153 Cal. 44 [94 Pac. 234]; *Winter* v. *McMillan,* 87 Cal. 256 [25 Pac. 407, 22 Am. St. Rep. 243].) Although it appears that the appellant Whittier Building and Loan Association is not entitled to any portion of the landowners' royalty payable from oil produced from the respondents' land, since the respondents did not prove that they own the Beatys' royalty interest under the lease, a judgment quieting title to it in them as against the association is improper. (*Knoke* v. *Knight, supra; Rocky* v. *Vieux, supra; Sears* v. *Willard, supra; Williams* v. *City of*

*San Pedro, etc. Co., supra; Jones* v. *Walker,* 47 Cal. App. (2d) 566 [118 P. (2d) 299].)

The judgment is reversed.

Gibson, C. J., Shenk, J., Curtis, J., Carter, J., Traynor, J., and Peters, J. pro tem., concurred.

Respondents' petition for a rehearing was denied October 22, 1942. Curtis, J., and Carter, J., voted for a rehearing.