[Civ. No. 12194. Third Dist. Oct. 1, 1970.]

VANTRESS FARMS, INC., Plaintiff, Cross-defendant and Respondent, v.
RAY T. SYDENSTRICKER et al., Defendants,
Cross-complainants and Appellants;
WILLIAM McGINNIS, Defendant, Cross-defendant and Appellant;
BUTTES GAS & OIL CO. et al., Cross-complainants and Respondents.

## Counsel

Weis & Huckins and Donald E. Huckins for Defendants, Cross-complainants and Appellants.

Roy J. Van den Heuvel for Defendant, Cross-defendant and Appellant.

Steel & Arostegui and Robert W. Steel for Plaintiff, Cross-defendant and Respondent.

Kenneth L. White for Cross-complainants and Respondents.

## Opinion

**PIERCE, P. J.**—Defendants and cross-complainants Ray Sydenstricker, Bernice Sydenstricker, his wife, and Charlene Marqua, their daughter (hereinafter referred to collectively as "Sydenstrickers") appeal from the judgments entered in favor of plaintiff Vantress Farms, Inc. ("Vantress") and defendant and cross-complainant (by interpleader) Buttes Gas and Oil Co. ("Buttes") et al., respectively. Defendant William McGinnis ("McGinnis") separately appeals from the same judgments.

The complaint of plaintiff Vantress was for declaratory relief in form. Actually it sought to quiet title and recover as against the Sydenstrickers and McGinnis certain gas and oil rights.[1] The Sydenstrickers and McGinnis

---

[1] "[A]ll the rents, royalties and benefits whatsoever accruing to the lessor of the real property hereinafter described under that certain community oil and gas lease dated May 28, 1931 and recorded June 26, 1931 in Book 19 of Sutter County Official Records at page 9, and all extensions, modifications and supplements thereto."

joined issue by their answers and the former by a cross-complaint for specific performance and the reformation of a deed. Buttes, the lessee under the community oil and gas lease, was neutral. It interpleaded the parties, deposited into court current amounts due as lessee and ultimately received judgment. The trial was protracted, the facts are lengthy and complicated, but the questions presented are not difficult.

## THE FACTS

The statement of facts will be more readily understandable if we explain what a community oil and gas lease is. This we will do in the margin.[2] The one here involved had been acquired in 1931 (see fn. 1) by the predecessors of Vantress. On Buttes' records this 1931 lease is identified as Parcel 19. The total lease comprises approximately 40,000 acres. The fair market value of Parcel 19's participating royalty interest as of December 1964 was $145,607. This interest, the Sydenstrickers and McGinnis say they bought for $2,000 under the circumstances to be set forth below.

Vantress was a world-wide business in the sale of pedigree cockerels. Its principal place of business is at Duluth, Georgia. Its president in 1964 was Dr. Fred Smith, a veterinarian. In August 1933 Vantress became the wholly owned subsidiary of Artnell, Inc., a Delaware corporation with its principal place of business in Chicago, Illinois. During 1964 the parent corporation adopted a program to sell real estate owned by Vantress not used directly in its corporate operations. Horace Sharrow, executive vice-president, treasurer and a director of Artnell, directed Smith to obtain values on those properties. One of such properties was Sutter Buttes Farm owned in fee and located in the Sutter Buttes area in Sutter County, containing 855 acres, plus the mineral rights to an adjacent 465-acre parcel—the "Noyes parcel." (The community gas and oil rights described belonged

---

[2]"In a community oil lease containing pooling agreements, each lessor assigns or conveys to his colessors a percentage interest in all oil produced on his land by the lessee during the continuance of the lease. The royalty interest thus transferred by each landowner to his colessors is an incorporeal hereditament in gross, and each lessor's interest in the oil produced upon the property of one of the colessors is entirely separate and distinct from the royalty interest retained by him in oil which might be produced from his own premises.

"Although the percentage of the royalty reserved by a lessor in oil produced from *his land* passes to a grantee of the fee as an incident of the conveyance, except as such rights are reserved by the deed, the incorporeal hereditament owned by the grantor in the oil produced from the *land of the colessors,* existing in gross, does not follow the conveyance of the lessor's land, *but can only be conveyed by a specific transfer of that interest.* (*Tanner* v. *Title Insurance and Trust Co.,* 20 Cal.2d 814, 820 [129 P.2d 383].)" (Ogden's Real Property Law (Leases), § 10.13, pp. 376-377; see also, *Agajanian* v. *Cuccio* (1956) 141 Cal.App.2d 828, 831-832 [297 P.2d 755]; *Friedrich* v. *Roland* (1950) 95 Cal.App.2d 543, 549-550 [219 P.2d 423].)

to Vantress under its former name, International Genetics Corporation by an assignment from the original owners.)

During September 1964 Smith contacted real estate salesman Gilbert Anderson, formerly employed by Vantress for 29 years. He discussed the sale of the farm with Anderson. On September 18 he executed an exclusive authorization to sell (to Hub Realty through Anderson). The authorization included the farm but reserved one-half the "mineral, oil and gas rights." The purchase price was to be $55,000.

The Sydenstrickers had been Vantress' tenants for the last 10 years. Anderson approached them as prospective purchasers informing them of the listing. On October 13, 1964, he obtained their $5,000 deposit. Anderson forwarded their receipt to Smith in Georgia for signature and acceptance. The deposit receipt signed by the Sydenstrickers mentioned no mineral rights other than the one-half interest on the Sutter Buttes Farm.

When the October 13, 1964 deposit receipt reached Smith he did not sign an acceptance and return it. Although there is a conflict in the testimony regarding the next steps it is susceptible to the inference (drawn by the trial court) that Smith, instead of trying to complete the deal as presented, had a better idea—for himself. He decided to by-pass the corporation for which he acted in a fiduciary capacity, and turn a deal for himself or, perhaps, for himself and his lifelong friend and cousin, William McGinnis, of Lompoc, California. The scheme was this: Smith would sell the Sutter Buttes Farm plus the mineral rights both to that land and to the Noyes parcel, keep one-half of those rights for himself (and McGinnis?) and sell the other half to the Sydenstrickers. The sales price of $55,000 would be increased by $2,000. Sydenstrickers would pay this amount, receiving 100 percent of the mineral rights but immediately resell one-half of those rights, the deed to be taken in the name of McGinnis.

The evidence conflicts as to whether Smith or Ray Sydenstricker had hatched this plan. The latter testified he broached the subject of buying the mineral rights of the Sutter Buttes Farm for $1,000.

Smith telephoned to McGinnis at Lompoc and told him of the plan. McGinnis did not know whether he was buying "a diamond mine or gold dust." Smith then phoned Anderson, instructing him to state his proposition to the Sydenstrickers. They were "willing."

The Sydenstrickers expressed no curiosity who McGinnis was or his relationship to Smith, what they were paying a net of $1,000 for. Ray Sydenstricker stated he had no idea of the value of any of the mineral rights. He knew of such things as community leases but he testified that all he

knew of their value was that they "varied."[3] He said that the Sydenstrickers were interested in buying the land primarily for cattle grazing but they "would have taken anything that came along."

On October 29, 1964 Anderson prepared, the Sydenstrickers signed, and there was forwarded to Smith, a deposit receipt agreement following the terms of Smith's proposition. Smith, when he received this, did not forward it to his principals in Chicago. Instead, he reported by telephone from Georgia, to Horace Sharrow in Chicago, that he had received an offer to purchase the Sutter Buttes Farm. Smith reported that they could sell the 855 acres in fee and the mineral interest in an adjoining 465 acres (the Noyes parcel) for $57,000. Asked by Sharrow whether the mineral interest was of any value, Smith assured him that it was of nominal value only. Upon further questioning as to whether any drilling had ever occurred upon the property to be sold, Smith stated that no drilling had occurred, that he thought it unlikely that any drilling would occur and that not too far from the farm a couple of wells had only produced dry holes.

At no time during the discussions regarding the sale of the farm did Fred Smith mention that Vantress owned an interest in a community gas lease, or what such a lease was. Neither did Smith send the receipt or a copy thereof to Sharrow.

Smith executed and returned the deposit receipt. When Anderson got it he opened an escrow at Yuba City Title Company dated November 13, 1964.

On November 23, 1964, Gabriel Gedvila, the secretary and counsel for Artnell Company, received seller's escrow instructions, a deed and a letter from Smith requesting execution of the documents forwarded and a certified copy of a resolution by the board of Artnell authorizing the sale of the farm and the mineral rights to the Noyes parcel. Gedvila did not receive the deposit receipt covering the agreement for the transfer and sale of the farm nor was there any mention in Smith's letter of the existence of an ownership interest in the lease.

Gedvila prepared the resolution and discussed it with Art Allen, president of Artnell, Sharrow, and the other directors of Artnell Company. Gedvila testified that at the time the resolution was circulated among the officers and directors of Artnell Corporation, neither he nor any of them

---

[3]The trial court may have doubted that testimony. The Sydenstrickers had lived in the immediate area for 45 years. Ray Sydenstricker's parents had owned 800 acres in the area. The parents had been one of the colessor-participants in the 1931 Buttes Community Lease adjacent to Parcel 19. Ray had represented the family in probating his mother's estate. During that probate a matter had arisen in which the value of such interest and the manner of its assignment was involved.

were aware that Vantress owned any interest whatever in Buttes Community Lease.

The board adopted a resolution. It authorized the sale only of the farm and the mineral rights appurtenant to the Noyes parcel.[4] The resolution was certified and a deed made conforming thereto. Both were returned to the title company in Yuba City.

On December 3, 1964 the Sydenstrickers delivered their buyers' escrow instructions to the title company. These included a demand for a specific assignment of the community lease interest. It may be noted that this was the first time the community lease had ever been mentioned in any of the negotiations. ■ It may be noted further that it is a recognition that community lease interests do not pass (under the rule of the *Tanner* case) by a deed referring to appurtenant "mineral rights."

At about this time Anderson received a personal check from Smith for $1,052.80. He was to use it for the "McGinnis" purchase if the McGinnis check did not clear. Anderson delivered the check to the title company. McGinnis also delivered a check. Smith had been prophetic—the McGinnis check did not clear and Smith's check was ultimately used.

Lee Gomer of the title company, following Sydenstrickers' instructions, forwarded a form of specific assignment of the community lease right to Gedvila requesting execution and return. In Chicago Gedvila brought the matter to the attention of President Allen of Artnell. Both were surprised to learn that such a lease existed and Allen directed an investigation. Meanwhile no assignment was to be given.

It is unnecessary to describe the course of the investigation by which Artnell discovered the shenanigans described above. It *did* discover them, permanently refused to make the assignment, and Artnell and Dr. Fred Smith parted company.

On January 20, 1965 the Sydenstrickers amended their instructions. They authorized the title company to close the escrow and complete the purchase of the property without the assignment. They had not yet given up hope altogether. They told Mr. Gomer still to try to get the assignment, if he could. He was unsuccessful.

---

[4]Appellants point to the fact that one of Artnell's officers had participated in signing a corporate deed six months before which contained a clause reserving the 1931 community lease interest (referring to it by book and page of the official records). That, they claim, is proof as a matter of law that Artnell's board intended that its resolution cover that lease in its reference to "mineral rights," notwithstanding testimony to the contrary and not withstanding the finding of the court to the contrary. Such a postulation cannot be upheld under principles of law too well settled to require reiteration here governing matters of law and distinguishing them from questions of fact.

The escrow was closed January 20, 1965. The closing statement was sent by the title company to Smith. He did not forward it to Artnell. As late as April Artnell had not learned of the close of the escrow. It did not learn of it until it sent Gedvila to Yuba City. He visited the title company, learned the escrow had been closed and also found out about McGinnis. Gedvila then visited McGinnis at Lompoc. McGinnis told Gedvila he thought he, McGinnis, had made a pretty good deal.

This action was filed on January 17, 1966.

## THE APPEAL

The appellants made seven contentions on appeal.[5] We do not have to reach any of them albeit all of them are meritless. ■ A single finding of the court demolishes every claim advanced. It supports the judgment; it is not challenged. The finding states:

"Defendants SYDENSTRICKER and MARQUA were informed of plaintiff's refusal to execute an assignment of its interest in the Buttes Community Lease; nevertheless, on or about January 20, 1965, knowing of such refusal and also knowing that an Assignment was or might be essential to conveyance of any interest in the Community Lease, said defendants modified their instructions to the escrow holder so as to direct close of escrow, and delivery of the deed, and payment of the price, without delivery of any such Assignment. That concurrent with said modification defendants SYDENSTRICKER and MARQUA instructed the title company to proceed to obtain an executed assignment if it was required for purposes of the transfer of the rights in the community lease."

■ An executed contract cannot be reformed where the aggrieved party, with knowledge of the facts accepts performance in accordance with the terms of the contract as written. (1 Witkin, Summary of Cal. Law (1960) Contracts, § 131, pp. 140-141 and cases there cited; see also *Lemoge Electric* v. *County of San Mateo* (1956) 46 Cal.2d 659, 665 [297

---

[5]The above named defendants contend on appeal that:

(1) The respondent at all times knew of the existence of the community oil and gas lease;

(2) Smith was authorized to sell the community oil and gas lease together with the real property and the mineral rights;

(3) The contract between the parties was indivisible;

(4) This is a proper case for reformation;

(5) The defense of inadequacy of consideration is not available in an action for reformation;

(6) The respondent seeks to set aside the transaction merely because it made a bad bargain; and

(7) The defense of unclean hands was not proved.

P.2d 638].) ▮ The fact that the finding quoted was unchallenged is significant. When it supports the judgment other questions become immaterial on appeal and may be disregarded. (*Balding* v. *Atchison, T. & S.F. Ry. Co.* (1964) 225 Cal.App.2d 254, 258-259 [37 Cal.Rptr. 215].)

▮ Appellants recognize the rule of *Tanner* v. *Title Ins. & Trust Co.* (1942) 20 Cal.2d 814 [129 P.2d 383]. They seek to counter its effect by citing *Sutter Youth Organization, Inc.* v. *Borsen* (1963) 214 Cal.App.2d 676 [29 Cal.Rptr. 628]. That case holds that if it was intended that the rights under the community lease should pass, reformation to express the intention of the parties would be a proper remedy. As we have shown, the rule does not apply where the party seeking to reform accepts the other party's performance with knowledge that he is relying on the contract as written. Moreover, in the case before this court it never was the intent of the seller, Artnell, to transfer the community lease. It was the intent of Smith but he was acting as an individual—on his own behalf and that of McGinnis. The court found: "Defendant McGINNIS and the said FRED R. SMITH conspired to defraud plaintiff. At all times herein involved, McGINNIS was the agent of Smith." Smith acted neither as the actual nor ostensible agent of Artnell in this transaction. Appellants failed to convince the trial court and have failed to convince this reviewing court that Smith had any "appearance of authority" to transfer, practically give away, property of Artnell worth $145,607 for $2,000 paid by Sydenstrickers and Smith.

The judgments are affirmed.

Friedman, J., and Janes, J., concurred.