Filed 10/5/22  Patacsil v. Perez CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## THIRD APPELLATE DISTRICT

(San Joaquin)

----

| | |
|---|---|
| ERNESTO PATACSIL, JR., | C093017 |
| Plaintiff, Cross-defendant and Appellant, | (Super. Ct. No. STKCVUBC20180008935) |
| v. | |
| HENRY PEREZ, | |
| Defendant, Cross-complainant and Respondent. | |

SUMMARY OF THE APPEAL

Plaintiff, cross-defendant, and appellant Ernesto Patacsil, Jr., appeals a trial court judgment awarding defendant, cross-complainant, and respondent Henry Perez quiet title to a parcel of real property.  On appeal, proceeding without a statement of decision, Patacsil argues that the trial court's judgment is not supported by substantial evidence.  In his opening brief, Patacsil does not supply any legal authority to explain the essential

elements of the various causes of action alleged by either party or otherwise provide any explanation as to why, under the law, we would need to reverse the judgment if we were to agree with his arguments regarding which facts are and are not supported by substantial evidence. Additionally, our necessarily limited review of the record and the law suggests that Patacsil's position is without merit. We affirm the judgment.

FACTS AND HISTORY OF THE PROCEEDINGS

*Events Leading to the Entry of a 2015 Settlement Agreement*

In May 2010, Henry Perez and Ernesto Patacsil, Jr., entered into a residential purchase agreement under the terms of which Patacsil would purchase certain real property from Perez. Both parties testified the purchase price of the property was $800,000, and that Perez made an initial payment of $75,000. Based on the purchase agreement documents admitted at trial, it appears the parties contemplated that Patacsil would pay off the remaining $725,000 due with monthly payments of $8,000, interest accruing on the balance at a rate of 5.5 percent, and a balloon payment due within five years of the close of escrow. Patacsil testified he did not secure other financing to purchase the property because he did not qualify for financing at the time of the 2010 purchase. Both parties testified that Perez paid another $75,000 towards the purchase price of the property over the succeeding years.

At some point after they executed the 2010 purchase agreement, Patacsil and Perez had a disagreement concerning the terms of the transaction, and in August 2014, they entered into a Settlement Agreement and Release (2014 Settlement Agreement) that was intended to "supersede[] any and all prior agreements, judgments or stipulations between the parties regarding the real property," and through which the parties intended to "release each other from all claims that they may have against each other, whether known or unknown."

2

*2015 Settlement Agreement*

On February 9, 2015, the parties entered into a second Settlement Agreement and Release (2015 Settlement Agreement), which, as the 2014 Settlement Agreement had done with respect to all prior agreements, "supersede[d] any and all prior agreements, judgments or stipulations between the parties regarding the real property . . . ."  Thus, this document is the one we focus on in ascertaining the rights and obligations of the parties.

Perez's duties are described as follows in the 2015 Settlement Agreement: "PEREZ shall sign all documents necessary to convey the PROPERTY entirely to PATACSIL in his name only and held in escrow under the terms below.  On the conditions stated and fully performed below by PATACSIL, PEREZ gives up all rights, title, and interests in the PROPERTY and foregoes any claims or causes of action, with prejudice in this matter.  Said documents shall be signed by PEREZ at Old Republic Title Company ('OLD REPUBLIC') . . . within five (5) business days of notification of completed escrow documents after this Settlement Agreement and Release has been fully executed.  Should OLD REPUBLIC deem additional documents are necessary for signature by PEREZ, PEREZ shall sign the documents within two (2) business days of notice.  Should PEREZ delay signing documents, an extension is granted to PATACSIL for the resulting corresponding delay. . . . Laura [K]onanz[1] will be the primary contact at OLD REPUBLIC . . . .  PEREZ shall not be required or responsible for any of the costs associated with the escrow.  PEREZ shall not encumber the property in any way in addition to the first and second loans ('LOANS') known to the parties.  PEREZ acknowledges these Loans are current and credit for payment shall go to PATACSIL since May 14, 2010, for any balance on that date to the current balance.  In addition, PEREZ shall cooperate fully in the efforts of PATACSIL in making the payment on the

---

[1]  The last name of Laura Konanz appears misspelled as Laura Conanz in the 2014 Settlement Agreement and 2015 Settlement Agreement.

3

Loans, to sell or refinance the PROPERTY from execution by PEREZ of this Agreement through February 15, 2017, as detailed below."

Patacsil's duties are described as follows in the 2015 Settlement Agreement: "[c]ontingent on PEREZ signing all documents necessary to convey the PROPERTY entirely to PATACSIL in his name only as indicated in #1, PATACSIL shall seek and obtain refinancing, or at PATACSIL'S option, sell the PROPERTY by and through February 15, 2017. PATACSIL acknowledges that there are Loans against the PROPERTY naming PEREZ as debtor. PATACSIL shall have sole responsibility and credit for the monthly payments of the Loans, insurance, and taxes in performance of this Agreement. PATACSIL shall have, at his option, the right to obtain financing or sell the PROPERTY at any time from now through February 15, 2017. PATACSIL must pay four thousand dollars ($4,000.00) immediately to maintain the loans in PEREZ's name and PATACSIL must pay the amount of one thousand dollars ($1,000) per month commencing March 15, 2015, to PEREZ on the fifteenth of each month through February 15, 2017."

In the 2015 Settlement Agreement, the parties acknowledged that "[i]t is the intent . . . to remove PEREZ from title of the PROPERTY and get PATACSIL on title. *The parties shall work together toward this end*." (Italics added.) The meaning of this agreement and whether the parties performed their obligations under it are the subject of this action.

### *The Parties Both Sought Relief in Court*

On July 23, 2018, Patacsil filed a complaint initiating this action, in which he alleged that Perez had breached the 2015 Settlement Agreement. In the first cause of action, Patacsil sought a declaration of his rights and duties with respect to the property pursuant to Code of Civil Procedure section 1060. In the second cause of action, Patacsil alleged that he had performed all his obligations under the 2015 Settlement Agreement,

4

other than those excused by Perez's alleged breach, while Perez had breached the terms of the 2015 Settlement Agreement by failing to deliver documents necessary to open an escrow. In the third cause of action, Patacsil sought an order that would require Perez to complete the sale, transfer, and conveyance of the property to Patacsil.

On November 26, 2018, Perez filed a cross-complaint. In the first cause of action, Perez alleged that Patacsil was in breach of contract because he had failed to take the requisite steps to complete his purchase of the property or to tender financing such that the parties could complete the transaction of the sale of the property. In the second cause of action, Perez sought to quiet title to the property and to receive a determination of his fee simple title to the property. Under the third cause of action for ejectment, Perez sought an order to have Patacsil return possession of the property to Perez. In the fourth cause of action seeking declaratory relief, Perez sought a determination that he owned the fee title interest to the property free of any claims by Patacsil.

### *Key Trial Testimony*

Patacsil's central argument is "the record, when viewed in its entirety, does not contain substantial evidence to support the judgment." " 'The testimony of a single witness may be sufficient to constitute substantial evidence. [Citation.]' (*Lui v. City and County of San Francisco* (2012) 211 Cal.App.4th 962, 969.)" (*Citizens Business Bank v. Gevorgian* (2013) 218 Cal.App.4th 602, 613.) As such, here we do not catalogue every statement made at trial but focus only on those that demonstrate substantial evidence that supports the trial court judgment.

For purposes of our analysis, the most important testimony was that of Laura Konanz. Konanz is an escrow officer with Old Republic Title Company and is identified as the parties' primary contact at Old Republic Title Company in the 2015 Settlement Agreement.

5

According to the Settled Statement on Appeal, Konanz provided testimony regarding her work on a possible escrow file for the property before the parties entered into the 2015 Settlement Agreement. She testified she opened an escrow for the property in 2014. In July 2014, Perez signed various documents to move towards paying off loans on the property and to confirm there were no liens on the property that would need to be resolved. She verified that a phone log from her office reflected that Perez had called her office in October 2014 to see if they were going to be able to close that month, and her assistant told him it did not look like they would be able to close because she had not yet been contacted by a lender on behalf of Patacsil. She said that there was nothing further she needed from Perez at that point in the escrow and he never refused to sign any documents she prepared.

Konanz also testified about her interactions with the parties following the entry of the 2015 Settlement Agreement. She testified about a notation on her phone log dated February 10, 2015, the day after the parties signed the 2015 Settlement Agreement. The log reflected a phone call between Konanz and Marilyn Patacsil, Patacsil's mother, who was "often involved in the deal." Patacsil's mother informed Konanz that they had decided to not pursue anything with the property for two years and would notify the lender.

Konanz testified that following the February 10, 2015, conversation with Patacsil's mother, she did nothing further on the escrow. She does not recall anyone contacting her in 2015 or 2016 to set up an escrow. Konanz did not recall ever hearing from Patacsil personally. Konanz testified that as a general practice, Old Republic Title Company would not prepare documents for Perez to sign until they were informed a loan was approved and ready to fund. Konanz stated that in order to complete the sale of the property, she would need a contract of sale and updated payoff statements from the two mortgage properties.

The documentary evidence admitted at trial supports Konanz's testimony that she did not hear anything regarding proceeding with an escrow from anyone in 2015 and 2016 after her February 10, 2015, conversation with Patacsil's mother. In reviewing the exhibits admitted at trial, the earliest date they reflect anyone communicating with Konanz regarding the sale of the property is October 27, 2017, when an employee of DM Capital Mortgage, Inc. (DM Mortgage)—Patacsil's likely mortgage broker for the property sale —e-mailed Patacsil's identifying information and information on loan amounts to Konanz. Konanz then asked a property services information manager to open an escrow, and that employee forwarded an escrow number to the DM Mortgage employee. Old Republic Title Company prepared an Estimated Settlement Statement which provided an estimate of how much it would take to pay off loans on the property and transfer the title. Konanz testified that she would then have the needed loan documents, a note, a deed of trust, and instructions on how to handle the escrow from the lender in order to move forward. She testified she did not receive any of these documents from the mortgage broker.

When Konanz was asked if Perez signed all documents necessary to convey the property, she said she never prepared any of those documents. When asked if she would have been the one to prepare the documents to transfer the property, Konanz responded "any escrow [officer] could have prepared them."

Derrick Moore of DM Mortgage also testified at trial. He testified regarding communications with Perez in 2017. According to Moore, when he spoke with Perez in 2017 about signing documents, Perez said he did not want to sign them and that he would not sign documents if mailed to his attention by overnight mail at the consulate in Mexico.

In contrast, when Perez testified about his communications with Moore in 2017, he said he did not say he was unwilling to sign documents to transfer the property. Perez said he represented to Moore that he would sign if Patacsil paid him $1,000 per month for

7

each month that loans on the property had remained in Perez's name and for which Patacsil had not already paid Perez $1,000. Perez testified Patacsil stopped making those payments in May 2017. On cross-examination, Patacsil's counsel questioned Perez regarding the $1,000 per month payments using a set of requests for admission that contain a verification that appears to be signed by Perez. Request for admission number 29 asks Perez to "[a]dmit that [y]ou have received $1,000 per month from [Patacsil] from approximately October 2014 through November 2017 to continue to carry the loans secured by the Property in [y]our name." The response is "[a]dmit." At trial, Perez denied signing the verification to the requests.

Some of Perez's deposition testimony was read at trial. The deposition was taken on February 3, 2020. At his deposition, Perez testified he had not signed a deed to be held in escrow since 2015. When asked if he would be willing to sign a deed to convey the property if Patacsil were to obtain financing at the time of the deposition, Perez responded, "[w]ell, right now, no, because as far as they owe me [a] minimum of 30 months at a thousand dollars a month. I don't feel I should give that up for no reason at all. Plus, I've lost a lot of money that I could have been making on a home on appreciation, also. Everything right now has been in their favor."

### *Judgment and Appeal*

On September 29, 2020, the trial court entered a judgment for Perez against Patacsil. The judgment does not specify factual findings or rulings on the individual causes of action alleged by each party in their respective complaints. The judgment states: "**IT IS ORDERED, ADJUDGED and DECREED** that Henry Perez have judgment against Ernesto Patacsil, Jr. as follows: [¶] Henry Perez is adjudged the owner of the fee title interest in the real property and improvements . . . and Ernesto Patacsil Jr. has no right title or interest in [the] property and improvements . . . . [¶] . . . Ernesto Pat[a]csil Jr. is awarded the sum of $108,132.21 as a lien on the property to be paid upon

8

either the sale or refinance of the real property; and  [¶]  Ernesto Pat[a]csil Jr. shall pay the monthly mortgages due on the real property so long as he remains in possession of the real property."

The record does not include a statement of decision under Code of Civil Procedure section 632, and neither party claims to have requested one.

Patacsil timely filed a notice of appeal on November 6, 2020.  Perez has not cross-appealed.

DISCUSSION

I

*Standards Applicable to our Review*

Before we consider the arguments Patacsil raises, we first discuss the contours of our review as shaped by the record, the standard of review we apply when someone alleges substantial evidence does not support a trial court's judgment, and the lack of citations in the opening brief explaining the law underlying the parties' causes of action.

A.  *No Statement of Decision*

There is no statement of decision—or any document laying out the trial court's individual verdict for each cause of action, let alone any document addressing the specific factual findings that led to the trial court's verdict on each cause of action—in this record. Additionally, neither party appears to have requested a statement of decision.

"A party's failure to request a statement of decision when one is available has two consequences.  First, the party waives any objection to the trial court's failure to make all findings necessary to support its decision.  Second, the appellate court applies the doctrine of implied findings and presumes the trial court made all necessary findings supported by substantial evidence.  (*Agri-Systems [, Inc. v. Foster Poultry Farms* (2008)] 168 Cal.App.4th [1128,] 1135; *Metis [Development LLC v. Bohacek* (2011)]

9

200 Cal.App.4th [679,] 691, fn. 7.)  This doctrine 'is a natural and logical corollary to three fundamental principles of appellate review:  (1) a judgment is presumed correct; (2) all intendments and presumptions are indulged in favor of correctness; and (3) the appellant bears the burden of providing an adequate record affirmatively proving error.' (*Fladeboe v. American Isuzu Motors Inc.* (2007) 150 Cal.App.4th 42, 58.)"  (*Acquire II, Ltd. v. Colton Real Estate Group* (2013) 213 Cal.App.4th 959, 970.)  Thus, here we will presume the trial court made all the findings necessary to support its judgment to the extent they were supported by substantial evidence.

"A single witness's testimony may constitute substantial evidence to support a finding.  [Citation.]  It is not our role as a reviewing court to reweigh the evidence or to assess witness credibility."  (*Thompson v. Asimos* (2016) 6 Cal.App.5th 970, 981.) Moreover, " '[u]nder the doctrine of implied findings, the reviewing court must infer, following a bench trial, that the trial court impliedly made every factual finding necessary to support its decision.'  (*Fladeboe v. American Isuzu Motors Inc.* (2007) 150 Cal.App.4th 42, 48 (*Fladeboe*).)"  (*Id.* at p. 981.)

Thus, on appeal Patacsil faces a very heavy burden.  Due to the lack of a statement of decision, we assume the trial court made every finding it needed to make to support its judgment if those finding are supported by substantial evidence, and, again, a single witness's testimony can be enough to satisfy the substantial evidence standard.

## B.  *Lack of Legal Citations Explaining Causes of Action*

Patacsil's central theory on appeal is that "the record, when viewed in its entirety, does not contain substantial evidence to support the judgment."  But in order for us to assess this claim, we need to consider what findings the trial court needed to make in order to reach its judgement—i.e., we need to know, under the law, what elements needed to be proven or disproven in order for the parties' causes of action to succeed or fail.  This is where we encounter yet another difficulty in our ability to consider this

10

appeal:  In his opening brief Patacsil does not provide us with *any* legal citations explaining the legal theories underlying the causes of action alleged or otherwise identify what findings the trial court needed to make to enter the judgment it entered.

Thus, Patacsil raises various arguments as to how certain factual findings may or may not be supported by substantial evidence in the record below, but he fails to articulate and support why, when viewed in light of the causes of action alleged by both parties and the law, those particular findings mattered.

As recognized by the Supreme Court in *Denham v. Superior Court of Los Angeles County,* (1970) 2 Cal.3d 557, "it is settled that:  'A judgment or order of the lower court is *presumed correct*.  All intendments and presumptions are indulged to support it on matters as to which the record is silent, and error must be affirmatively shown.  This is not only a general principle of appellate practice but an ingredient of the constitutional doctrine of reversible error.' "  (*Id.* at p. 564; see also *People v. Giordano* (2007) 42 Cal.4th 644, 666; Cal. Const., art. VI, § 13 [forbidding reversal of judgment absent a showing of error that "has resulted in a miscarriage of justice"].)  Thus, an appellant must demonstrate error through "meaningful legal analysis supported by citations *to* authority and citations to facts in the record that support the claim of error."  (*In re S.C.* (2006) 138 Cal.App.4th 396, 408, italics added; see also *Martine v. Heavenly Valley Limited Partnership* (2018) 27 Cal.App.5th 715, 728; Cal. Rules of Court, rule 8.204(a)(1)(B).)  " 'When legal argument *with citation to authority* is not furnished on a particular point, we may treat the point as forfeited and pass it without consideration.  (*Okasaki v. City of Elk Grove* (2012) 203 Cal.App.4th 1043, 1045, fn. 1; *Keyes v. Bowen* (2010) 189 Cal.App.4th 647, 656.)  . . . *We are not required to examine undeveloped claims or to supply arguments for the litigants.  (*Maral v. City of Live Oak* (2013) 221 Cal.App.4th 975, 984–985; *Mansell v. Board of Administration* (1994) 30 Cal.App.4th 539, 546 [it is not the court's function to serve as the appellant's backup counsel].)'  (*Allen v. City of*

11

*Sacramento* (2015) 234 Cal.App.4th 41, 52.)" (*Martine v. Heavenly Valley Limited Partnership, supra*, 27 Cal.App.5th at p. 728, italics added.)

II

*Evidence Supports a Finding that Perez's Nonperformance Under the 2015 Settlement Agreement Was Justified*

A brief review of Patacsil's sub-arguments suggests his central argument that substantial evidence does not support the judgment would lack merit, even if he were to have tried to supply legal authority to support his argument for reversing the judgment.

Based on the arguments he has made, it appears Patacsil is proceeding under an argument that Perez breached his obligation under the 2015 Settlement Agreement by failing to perform, and that Patacsil fulfilled his obligations to the extent he was required to before Perez satisfied his obligations. Therefore, Patacsil seems to suggest the trial court erred both in awarding the quiet title to Perez, and not ordering Perez to move forward with the sale and transfer of the property.

"In interpreting the settlement agreement, we apply the general rules of contract interpretation. (*Edwards v. Arthur Andersen LLP* (2008) 44 Cal.4th 937, 953 (*Edwards*).)" (*Khavarian Enterprises, Inc. v. Commline, Inc.* (2013) 216 Cal.App.4th 310, 318.) "A contract must be so interpreted as to give effect to the mutual intention of the parties as it existed at the time of contracting, so far as the same is ascertainable and lawful." (Civ. Code, § 1636.) "When a contract is reduced to writing, the intention of the parties is to be ascertained from the writing alone, if possible." (Civ. Code, § 1639.) "The words of a contract are to be understood in their ordinary and popular sense, rather than according to their strict legal meaning; unless used by the parties in a technical sense, or unless a special meaning is given to them by usage, in which case the latter must be followed." (Civ. Code, § 1644.) And, if words are technical, they "are to be

interpreted as usually understood by persons in the profession or business to which they relate, unless clearly used in a different sense." (Civ. Code, § 1645.)

"The standard elements of a claim for breach of contract are '(1) the contract, (2) plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4) damage to plaintiff therefrom. [Citation.]' (*Regan Roofing Co. v. Superior Court* (1994) 24 Cal.App.4th 425, 434–435.)" (*Wall Street Network, Ltd. v. New York Times Co.* (2008) 164 Cal.App.4th 1171, 1178.) "California law recognizes that a contract may be breached by nonperformance." (*Central Valley General Hospital v. Smith* (2008) 162 Cal.App.4th 501, 514.) A "breach by nonperformance" is "an *unjustified* failure to perform a material contractual obligation *when performance is due*." (*Id.* at p. 514, fn. 3, italics added.)

With these rules in mind, and the evidence presented, we consider Patacsil's first three arguments. His first two arguments essentially boil down to an argument that Perez failed to carry out his obligations under the plain language of the 2015 Settlement Agreement because he never signed documents that would transfer title to the property to Patacsil. As part of these arguments, Patacsil suggests that he was not obligated to obtain financing before Perez signed documents transferring title. Additionally, Patacsil's third argument is that the evidence demonstrates he was ready and able to perform his obligation under the 2015 Settlement Agreement by obtaining loans in his name as soon as Perez performed his duties.

But these arguments actually overlook the plain language in the 2015 Settlement Agreement describing when and how Perez's duty to sign documents transferring title would be triggered, and the work Patacsil or his agents needed to perform to get to the point where Perez would have documents to sign. Specifically, the 2015 Settlement Agreement specified Perez would be required to sign the necessary documents, "at Old Republic Title Company ('OLD REPUBLIC') . . . *within five (5) business days of*

13

*notification of completed escrow documents* after this Settlement Agreement and Release has been fully executed." (Italics added.)

Thus, under the plain terms of the agreement, Perez's obligation to sign documents to transfer the title would not be triggered until the necessary escrow documents were prepared. But, Konanz, who was the escrow officer identified as the parties' contact at Old Republic Title Company in the 2015 Settlement Agreement testified that she never prepared a document to transfer the title from Patacsil to Perez, and that an escrow officer like her would have been the one to prepare that form. When asked why she never prepared escrow documents for the transfer between 2015 and 2017, Konanz answered she had not received the information she needed from Patacsil's lender.

Additionally, to the extent Konanz received any communications from anyone on Patacsil's side during 2015 and 2016, her records show she received a call from Patacsil's mother the day after the 2015 Settlement Agreement was signed, and his mother stated they were not planning to do anything with the property for two years. Regardless of when in relation to Patacsil securing funding Perez was obligated to sign documents transferring title to the property, Perez was not obligated to sign anything until notified that the necessary documents had been prepared for his signature by Old Republic Title Company. To the extent those documents were not prepared, nothing suggests Perez had an independent obligation to reach out to Old Republic Title Company to prepare them, and the evidence supports a conclusion that the necessary documents were not prepared because of the escrow officer's communications, or lack thereof, with Patacsil or his representatives led to the delay in document preparation. In short, even if evidence may have shown Perez did not sign a document transferring title and that Patacsil had a funding source in place, the trial court could still have concluded Perez did not breach the contract. This is so because substantial evidence supports that the triggering event of the preparation of documents that would transfer title never occurred, and that event never occurred due to Patacsil and his agents' representations and inactions.

14

Hence, substantial evidence supported a finding that Patacsil's performance—i.e., signing documents to transfer title to Patacsil—was hindered by actions taken or not taken by Patacsil and those acting on his behalf between February 2015 and late 2017. " 'Each party to a contract impliedly agrees not to prevent the other party from performing or to render performance impossible by any act of his own.' (17 C.J.S. 967.) Prevention of performance is equivalent to repudiation. (*Woodruff v. Adams* (1933) 134 Cal.App. 490.) In *Bewick v. Mecham*, 26 Cal.2d 92, 99, the court said: '*Each party to a contract has a duty to do everything that the contract presupposes that he will do to accomplish its purpose* (*Epstein v. Gradowitz*, 76 Cal.App. 29, 32; see Williston, Contracts (1937 rev. ed.) § 1293) and a duty not to prevent *or hinder* performance by the other party. (*Tanner v. Title Ins. [& Trust] Co.*, 20 Cal.2d 814, 825; see Williston, *op. cit.*, § 1293A; 4 Cal.Jur. 10-Yr.Supp. (1943 rev.), [§] 142.)' " (*Orton v. Embassy Realty Associates, Inc.* (1949) 91 Cal.App.2d 434, 438-439, italics added.)

Both parties were expected to "work together" with the goal in mind of completing the sale and transfer of the property. On this record, there was substantial evidence to support a court finding that instead of Patacsil or his agents working to achieve the goal by assisting the escrow officer, Konanz, in obtaining information she needed to prepare escrow documents for Perez to execute, (1) Patacsil never personally contacted Konanz; (2) the day after the 2015 Settlement Agreement was signed, Patacsil's mother placed a call to the escrow officer that caused the officer to halt efforts to close the sale that she and Perez had made progress on in late 2014; and (3) the first time after February 10, 2015, that anyone tried to communicate with Konanz on Patacsil's behalf was in October 2017, nine months after the February 15, 2017, the date by which Patacsil was to refinance or sell the property as contemplated in the 2015 Settlement Agreement had passed. To the extent Perez did not perform, substantial evidence supports a conclusion by the trial court that nonperformance was justified by Patacsil's failure to work with the escrow officer to allow her to prepare the documents

15

needed for Perez to perform. Thus, Patacsil did not demonstrate that Perez unjustifiably refused to perform under the 2015 Settlement Agreement by failing to sign documents transferring title to the property to Patacsil.

III

*Arguments Regarding Extending the 2015 Settlement Agreement*

In his fourth argument, Patacsil argues he paid to extend the terms of the 2015 Settlement Agreement to November 2017—when DM Mortgage finally started communicating with the escrow officer—by continuing to make $1,000 payments to Perez. To support this argument, he cites to Perez's purported admission that he "received $1,000 per month from [Patacsil] from approximately October 2014 through November 2017 to continue to carry the loans secured by the Property in [his] name," and to his own testimony that he stopped making the payments in "late 2017."

It is true that "[a]ny matter admitted in response to a request for admission is conclusively established against the party making the admission in the pending action." (Code Civ. Proc., § 2033.410.) However, Perez denied signing the verification to the set of requests for admissions that contain the subject admission, and Patacsil has made no argument that the trial court could not or should not have found Perez's representation on this matter credible. Moreover, Patacsil himself testified that he made his last payment in September 2017 not November 2017. Finally, the only thing Perez seemingly admitted to in his admission is to accepting $1,000 per month as a fee to continue carrying the existing loans in his name through November 2017—at a possible risk to his own credit, while Perez maintained possession of the property. Patacsil has not provided us with authority or evidence that would cause us to conclude that, with the payment and acceptance of the $1,000 per month past February 2017, the parties reached a binding agreement to extend beyond February 2017 Patacsil's option to sell the property or refinance it in his name.

16

## IV

### *Causes of Action Ruled on by the Trial Court*

In his last sub-argument, Patacsil claims the trial court rejected Perez's claims alleging breach of contract and ejectment because the trial court granted no relief on those claims. This argument is undeveloped. It contains no citations to the record that tie together allegations, requests for relief, and findings to show this is an accurate depiction of the trial court's legal findings. Also, it contains no legal citations demonstrating that, even if this is an accurate depiction of the trial court's legal findings of the breach of contract and ejectment actions, the judgment cannot stand on the remaining causes of action.

### DISPOSITION

We affirm the trial court's judgment. Perez shall recover his costs on appeal. (Cal. Rules of Court, rule 8.278 (a) (1), (2).)

_____,
HULL, Acting P. J.

We concur:

_____,
RENNER, J.

_____,
EARL, J.

17